In the Matter of the Estate of Josephine A. Drisch, Deceased.

Richard E. Landau, Petitioner-Appellant, v. Estate of Josephine A. Drisch, Respondent-Appellee.

Gen. No. 69–19.

Second District.

August 26, 1969.

 

Snyder, Clarke, Dalziel, Holmquist & Johnson, of Waukegan, for appellant.

Runyard, Behanna, Conzelman, Schultz & O'Meara, of Waukegan, for appellee.

MR. JUSTICE ABRAHAMSON delivered the opinion of the court.

Richard E. Landau brings this appeal from an order of the Circuit Court of Lake County that denied his petition to restate heirship and for other relief. In said petition he alleged that he was the natural son of Josephine A. Drisch, deceased, or, in the alternative, that Josephine Drisch had entered into a contract to adopt him and, that in either event, he was her sole heir.

Josephine Drisch died on November 16, 1966, and on November 22 a petition was filed in Lake County by Florence P. Witt wherein she alleged that she was a sister of the decedent and her sole heir. Letters of Administration were issued to a Lake County attorney pursuant to the petition since Florence P. Witt was a resident of New York and an inventory subsequently filed that disclosed assets of approximately $27,000.

On July 6, 1967, Richard Landau filed his petition in the estate wherein he alleged that he was the son and only child of the decedent. After the matter proceeded to trial, the petition was amended to include, in the alternative, that the decedent had entered into a contract to adopt Landau. The hearing proceeded, without a jury, and on January 8, 1968, the trial court dismissed, for insufficient evidence, that portion of the petition wherein Landau alleged he was the son of the decedent and took the alternate proposal under advisement. On July 19, 1968, the trial court filed a lengthy memorandum to the

243

effect that the petitioner failed to prove a contract and on July 30, 1968, entered judgment in favor of the respondent. Post-trial motions were denied and this appeal followed. The petitioner here asserts that the finding of the trial court that he was not the son of the decedent was against the manifest weight of the evidence and that the facts proved an enforceable contract to adopt.

It is stipulated by the parties that the real name of Josephine Drisch was Josephine Polk and it further appears. that she was married to a Claude Devinger on August 8, 1921, in Chicago. In 1934, Josephine obtained a divorce from Claude Devinger in Cook County and apparently never remarried. Devinger is also deceased.

Henry Devinger, a brother of Claude, testified for the petitioner that Claude and Josephine lived in Peoria in. 1922 but moved into his parents' home in Chicago in the summer of that year with Landau, then a baby of two weeks of age. Shortly after they arrived, Henry was present during a conversation when Josephine informed his mother that the baby had been adopted in Peoria. About one month later, Henry heard Josephine state that the child was her own and that she had taken the boy to an orphanage in Peoria because her mother "would have a fit" if she had learned of the birth. He later heard his brother state that he wanted to adopt the child so that he could be named Claude Devinger, Jr.

Harriet Esposito testified that she had been a friend of the decedent for many years and had first met her in Peoria in 1922. She first saw the child in Chicago in 1923 when Josephine told her ". . . he is my son." Later, Josephine introduced Harriet to a boarder at her mother's rooming house named Mr. Richard Landau, a "nice, refined gentleman" many years older than Josephine and told her that he was the father of her child. Harriet also testified that Claude Devinger had stated in her presence that he wished to adopt the boy.

244

Idabell Devinger testified that she was married to Henry in 1929 and that sometime in 1930 she had a conversation with Josephine who informed her that Landau was her son and that the father had been a boarder in her mother's rooming house. Idabell also heard both Josephine and Claude state that they wished to adopt the boy so that he could be named Claude Devinger, Jr.

Florence Witt was called as an adverse witness under section 60 of the Civil Practice Act and testified that she first saw Landau in 1922 when she was informed he was taken from an orphanage. She further testified, as had the others, that Josephine always referred to Landau as "son" and that he called her "mother." Numerous letters of the decedent were also introduced where she referred to Landau as her son.

Although no birth certificate apparently exists in this matter, it appears that Landau was born on June 23, 1922, in Ottawa, Illinois, and left at the Guardian Angel Orphanage in Peoria where he was baptized on June 25, 1922, as Robert Edmund Landau. Although Henry Devinger testified that the boy was taken to Chicago when he was about two weeks old, the orphanage records, including a letter signed by Josephine, indicate that the child had been given to the Devingers in December of 1922.

Landau lived with Josephine until his induction into the Army in June, 1940, although he had been returned to Guardian Angel Orphanage for about six weeks in 1936 and to Our Lady of Mercy Mission in 1940 because of disciplinary problems. After his discharge from the service in 1946, Landau returned to Chicago and lived with Josephine until his marriage. A life insurance policy left by Josephine designated "Richard Landau—son" as beneficiary.

Mildred Schriver testified for the respondent that she had been a neighbor and friend of the Polks and knew Josephine well. In 1933, Josephine told her that she would

245

divorce Devinger except that she was fearful the boy would be returned to the orphanage. Violet Wechelberger testified that she was a cousin and close friend of Josephine and saw her often in 1922 and that she had not been pregnant. Subsequently, Josephine told her cousin that she was unable to adopt the boy because of "legal barriers."

The orphanage records and files maintained by the Catholic Home Finding Association were admitted into evidence in full. A letter dated November 22, 1923, from the Department of Public Welfare of the State of Illinois to the Association appears therein that states that the child had been given to the Devingers "on trial" and that they had moved from Peoria "in the night leaving a lot of unpaid bills and no address and took the baby with them." In February, 1924, the Department wrote to the Association that the child should be left with the Devingers temporarily but "that no adoption should be entered." In 1941, Josephine wrote to the orphanage and stated that "I do not have any of the necessary information to fill out the birth certificate blank and I was wondering if it would be at all possible to secure a baptismal certificate for Richard . . . . Perhaps it would be possible to contact his sponsors and secure some information."

▮ With this, and much other evidence before it, the trial court concluded that it was not proven that Richard was the natural son of the decedent. We cannot say that this conclusion was against the manifest weight of the evidence. Henry Devinger was 15 years old when he heard the conversation in regard to Landau's parentage. Harriet Esposito was the only witness to connect the child with the boarder, Richard Landau, whom she had seen only once in her life, approximately 45 years before her testimony. Although these witnesses testified that Josephine had acknowledged in their presence that Landau was her natural son it was the function of the trial court to weigh that evidence with the other facts

246

before it. The extensive records maintained by the Catholic Home Finding Association, including the reports of numerous interviews with Josephine, do not contain even a suggestion that she was, or claimed to be, Landau's natural mother although that fact would have been of extreme importance and eliminated her anxiety to keep the boy. At Josephine's request, the orphanage made several attempts to discover a birth certificate for Landau but met with no success. One notation indicates that the boy had been left at the orphanage by two unidentified policemen shortly after his birth. From the language employed by Josephine in her requests for a certificate, it appears that she possessed no more knowledge of his actual birth than anyone else. Although she called Landau "son" and he called her "mother," that fact is not surprising since she unquestionably raised the boy from infancy. She named Landau beneficiary of her life insurance as "son" but she also named "Edward Drisch— husband" on another policy although she was never married to him.

■ It was, of course, the province of the trial court to consider all these details and conflicts, to listen to the witnesses and determine their credibility and draw inferences and conclusions from the evidence presented to it. It is not our function to substitute our judgment for that of the trier of fact unless that judgment is against the manifest weight of the evidence. Harvey v. Lippens, 87 Ill App2d 363, 368, 231 NE2d 613.

We do not feel that the trial court improperly discounted the testimony of the petitioner's witnesses on the mistaken idea that the propositions that Landau was the natural son of Josephine and that she had contracted to adopt him were wholly inconsistent. Although the memorandum submitted by the trial judge mentions that this inconsistency "definitely" affected the weight of Henry Devinger's testimony, it does not appear that it was of great importance in his ultimate decision.

The petitioner further urges that the facts disclose that the Guardian Angel Orphanage had entered into an oral agreement with the Devingers to adopt him and that the orphanage fulfilled its part of the agreement by delivering him to them in 1922. He concludes that the agreement was binding on the parties and should have been specifically enforced by the trial court.

The Supreme Court in Weiss v. Beck, 1 Ill2d 420, 427, 115 NE2d 768, also considered the specific performance of a contract for adoption. The court reviewed nine earlier decisions on the same point and found that in only three of those cases were the alleged contracts specifically enforced. In each of the three the ". . . proof included either a written memorandum of the alleged agreement to adopt found among the papers of the deceased foster parents, or the positive testimony of some surviving witness who was present and heard the making of the agreement to adopt."

In the later case of Monahan v. Monahan, 14 Ill2d 449, 153 NE2d 1, cited by both parties as the leading Illinois case on the point, the Supreme Court explained that it had not intended in the Weiss case to hold that a contract to adopt could not, in any case, be proven by circumstantial evidence. In Monahan, the petitioner had been left by his natural parents with the Monahans when he was two years old and the natural mother paid the Monahans $8 a week for board. In 1926, the father abandoned the family and in 1929 the mother gave her consent to the Monahans for adoption. A note written by Mr. Monahan stated "Gave Teddy to me on this day, Ap. 30, 1929." Thereafter, the Monahans raised the boy as their own, had him baptized as Edward Monahan and on two occasions attempted to legally adopt him but were frustrated in that purpose because of incorrect advice furnished by their lawyer. The court found that a contract to adopt did exist but adhered to the strict requirements of the earlier cases. In commenting on the Weiss decision, the court stated at pages 452 and 453:

"We there indicated that the parol testimony supporting the existence of a contract upon which specific performance may be had must be clear and conclusive of the existence and terms of the contract, leaving no room for reasonable doubt. The court in such case will weigh the evidence scrupulously and with caution. The evidence in support of the alleged contract must be strong and compelling, and the evidence must not be readily harmonizable with any other theory."

The court did not then dilute the requisites to prove the existence of the contract but only stated that it could, in some situations, be established by circumstancial evidence.

 We do not feel that the evidence of a contract to adopt in this case meets the tests of the Monahan and earlier decisions or that it can ". . . not be readily harmonizable with any other theory."

From the records of the orphanage and the Catholic Home Finding Association, it appears that they were interested in placing their children with families of suitable Catholic background. The visitation records maintained by them indicate that from the beginning this was the problem in this placement since the Devingers were not married in the Catholic Church. Those records indicate that Claude Devinger had been married before and did not attend church on any regular basis. There are repeated references to the fact that the Devingers did not keep their part of the "agreement" but it is clear that the reference is to an agreement to correct their marital relation and attend church rather than an agreement to adopt as contended by the petitioner. That this is so is borne out by the notations of the agent's reports. On January 14, 1924, the agent noted . . . "give family another trial, awaiting the outcome of their marriage affair . . . ." On September 19, 1924, he noted "Asked her to tell Devinger that he must attend his own parish

church so we could check up on his Catholicity . . . that he failed to fulfill any of his part of the agreement." In September of 1926 Josephine told the agent that Devinger had been "scared good" by a missionary priest and that she was confident he would return to church regularly.

This evidence does not harmonize with the theory that the Devingers had failed, for whatever reason, to keep their promise to adopt the petitioner made when they first obtained him but rather that the orphanage had delivered the child on a "trial" basis to see if a suitable religious environment would be provided. Josephine's later actions, including her return of Landau to the orphanage during his adolescence, is consistent with this "trial" theory. It is also not established that the orphanage, in any event, had the capacity to enter into an adoption agreement since the origin of their custody is completely unknown.

█ Finally, the petitioner complains that he should have been permitted to testify despite the strictures of section 2 of the Evidence Act since Florence Witt had testified as to heirship when the estate was first opened.

Section 2 precludes a party to an action from testifying when an adverse party sues or defends as an heir of the deceased person. Clearly, Landau was prohibited from testifying by that Act. When Florence Witt testified it was not an adverse proceeding and she was competent to do so as a routine matter of establishing heirship. Estate of Diak, 70 Ill App2d 1, 217 NE2d 106. She only testified as a section 60 witness once the matter became adverse.

For the reasons stated, the judgment of the trial court will be affirmed.

Judgment affirmed.

MORAN, P. J. and DAVIS, J., concur.