# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *DeHart v. DeHart*, 2013 IL 114137

---

| | |
|---|---|
| Caption in Supreme Court: | JAMES THOMAS DeHART, Appellee, v. BLANCA DeHART, Indiv. and as Ex'r of the Estate of Donald M. DeHart, Appellant. |
| Docket No. | 114137 |
| Filed | March 21, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Complaint counts against decedent's second wife and widow, individually and as executor of his recently drafted will, should not have been dismissed with prejudice where her undue influence and decedent's lack of testamentary capacity were alleged and where plaintiff, who did not benefit from the will, was the son of the decedent's first wife and had been held out by decedent as his own child; and counts for contract to adopt and equitable adoption should also be allowed to stand—standards therefor explained. |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Will County, the Hon. J. Jeffrey Allen and the Hon. Paula Gomorea, Judges, presiding. |
| Judgment | Appellate court judgment affirmed. |

Counsel on Appeal    Adrian Mendoza, Joseph P. Wleklinski, Jr., and Edward R. Sherman, of Lillig & Thorsness, Ltd., of Oak Brook, for appellants.

Thomas M. Paris, of Chicago, for appellee.

Justices    JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Garman, Karmeier, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, James Thomas DeHart, filed a six-count, second-amended complaint against Blanca DeHart, in her individual capacity and as executor of the estate of Donald M. DeHart (Donald), deceased, contesting Donald's will dated December 4, 2006, and raising claims of lack of testamentary capacity, undue influence, fraudulent inducement, tortious interference with economic expectancy, contract for adoption and equitable adoption. The circuit court of Will County dismissed with prejudice all of plaintiff's counts. The circuit court also denied plaintiff's motion to compel the deposition of William J. Peters, the attorney who drafted the disputed will. Plaintiff appealed, and the appellate court reversed the dismissal of all six counts and reversed the denial of the motion to compel the deposition of attorney Peters. The appellate court's decision was unanimous on all matters, except on the contract-for-adoption count, in which case one justice dissented, finding that there were insufficient factual allegations to support a cause of action for that claim. 2012 IL App (3d) 090773. This court subsequently allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 2                                    BACKGROUND

¶ 3    The following facts were alleged in plaintiff's second amended complaint and are set forth in the appellate court's opinion. During Donald's lifetime and for more than 60 years, he held plaintiff out to both individuals and institutions as his biological son. In May 2003, Donald made arrangements for his own funeral and listed plaintiff as his son. Donald listed plaintiff's children and grandchildren as his own grandchildren and great-grandchildren. In addition to telling members of the community over the years that plaintiff was his son, Donald provided plaintiff with a birth certificate that listed Donald as plaintiff's natural father. Throughout their lifetimes, Donald and plaintiff used the purported birth certificate, to conduct the affairs of life (until the year 2000), using it to enroll plaintiff in grade school and high school and using it to convey to those requesting proof of identity that plaintiff was Donald's son.

-2-

¶ 4    In 2000, however, plaintiff attempted to use the birth certificate to obtain a passport, and the United States passport office would not accept it as a record of plaintiff's birth, instead requiring him to produce a certified (raised stamp) copy of his birth certificate. Plaintiff obtained the certified copy from the Cook County Office of Vital Statistics and learned that it was identical in most respects, except it listed his name as James Thomas Staley, Jr. and his father's name as James Thomas Staley, Sr., and did not mention "DeHart" after his mother's maiden name. Both birth certificates listed plaintiff's birth date as May 23, 1944.

¶ 5    Plaintiff then confronted Donald with the information contained on the certified copy of the newly obtained birth certificate. In response, Donald said that plaintiff's mother, Virginia, married Staley, plaintiff's biological father, after she became pregnant out of wedlock in 1943. Donald also told plaintiff that he adopted plaintiff in 1946 when plaintiff was two years old, but he had agreed with Virginia to keep the adoption a secret for the good of plaintiff and the family. As part of this agreement, Donald and Virginia agreed to celebrate their wedding anniversary, but never discuss how many years they had been married. Donald also explained in no uncertain terms that he had hired a lawyer in Homewood, Illinois, to handle the adoption so that "it was all legal."

¶ 6    There is no legal documentation of an adoption in the record. Plaintiff's mother, Virginia, died in April 2001. She was suffering from early onset dementia at the time plaintiff learned of the information on the certified birth certificate. James Staley, Sr., abandoned plaintiff and Virginia when plaintiff was two years old and has had no contact with plaintiff in the ensuing six decades.

¶ 7    Even after plaintiff confronted Donald in 2000 about the birth certificates, Donald continued to represent and describe plaintiff as his son. In May 2003, Donald made funeral arrangements listing plaintiff as his son. In the spring of 2005, Donald, plaintiff and plaintiff's wife and children took a family vacation—with Donald assuming the bulk of the costs and expenses. Donald also executed a will that was prepared prior to December 2006 that provided bequests for plaintiff, plaintiff's children and Donald's church. This prior will was prepared by the law firm of Krusemark and Krusemark in Frankfort, Illinois, and plaintiff alleges that the original is in the exclusive control of defendant who is either preventing it from surfacing or has destroyed it.

¶ 8    Donald met defendant while she was working at a jewelry counter at a Tinley Park Sam's Club in the spring of 2005. The two were married on December 5, 2005; at that time, Donald was 83 years old and defendant was 54 years old. Donald invited plaintiff to the wedding and reception. But the complaint does not mention whether plaintiff attended the wedding.

¶ 9    The complaint alleges that on December 4, 2006—the day before Donald's and defendant's first wedding anniversary—Donald signed the contested will in the office of attorney William J. Peters. At that time, Donald was 84 years old. The will states, "I am married to Blanca DeHart. I have no children." The complaint further alleges that Donald demonstrated he was of unsound mind and memory when he signed the will and could not remember plaintiff—now 61 years old—whom Donald had held out to all the world as his son for nearly 60 years.

¶ 10    The complaint further alleges that in the months between the wedding of defendant and

Donald and the execution of the contested will, defendant developed and maintained a position of trust and confidence, amounting to a fiduciary relationship with Donald. Despite the fact that she had only been married to Donald a short time and he had amassed his wealth over 84 years of his life, she became joint tenants with Donald on real estate, bank accounts and brokerage accounts worth millions of dollars. She also obtained a power of attorney to act on Donald's behalf, and exercised significant control over Donald's real estate dealings, including the sale of the family farm.

¶ 11    The complaint also alleges that defendant made several misrepresentations to Donald concerning plaintiff and his character, each of which was told to Donald shortly before the execution of the will on December 4, 2006. In particular, defendant lied to Donald by telling him that plaintiff was not his son and by not telling Donald that plaintiff and other family members had called him on the telephone and had sent cards and letters, as well as intercepting and destroying those cards and letters. Defendant's lies were made in order to improperly force and persuade Donald to alter his will by providing exclusively for her, as opposed to plaintiff, who would otherwise inherit as next of kin or, alternatively, as specifically stated in Donald's prior will. Donald, succumbing to defendant's influence, executed the will on December 4, 2006, stating that he had "no children," when in fact he did. The complaint alleges that under all of these circumstances, the will was the product of defendant's influence and therefore not the last will of Donald.

¶ 12    Donald died in February 2007, a couple of months after executing the will in question on December 4, 2006. After Donald's death, defendant filed that will in the circuit court of Will County. Plaintiff's second amended complaint challenges that will on the grounds of testator incapacity (count I) and as the product of undue influence by defendant (count II). The complaint also alleges that defendant fraudulently induced Donald into executing the new will (count III), and it seeks to set aside the purported will and compel distribution of the estate under the prior will or pursuant to law or equity based on intentional interference with testamentary expectancy (count IV). Finally, the complaint alleges that Donald entered into a contract to adopt plaintiff (count V), and that in any event, an equitable adoption occurred under the circumstances and that Donald's estate is therefore estopped from denying plaintiff as an heir at law (count VI). Additionally, plaintiff sought to compel the deposition testimony of William J. Peters, the attorney who prepared the December 2006 will, and defendant objected on the basis of attorney-client privilege.

¶ 13    In July 2009, defendant moved to dismiss the second amended complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2008)), arguing that the complaint failed to allege sufficient facts to state a cause of action. The circuit court dismissed with prejudice all of plaintiff's counts and denied his motion to compel the deposition of attorney Peters.

¶ 14    Plaintiff appealed. The appellate court unanimously reversed the dismissal of counts I through IV and count VI, along with the denial of the motion to compel the deposition testimony of attorney Peters. 2012 IL App (3d) 090773. A majority of the court also reversed the dismissal of count V. *Id*. ¶ 42. With respect to that count, Justice Schmidt dissented, believing that the complaint failed to identify the parties to the contract to adopt and whether the agreement was oral or written, and therefore plaintiff failed to allege a valid cause of

action on that count. *Id*. ¶¶ 62-63 (Schmidt, J., concurring in part and dissenting in part). Although the appellate court unanimously concluded that dismissal of the equitable adoption count must be reversed, Justice McDade wrote separately to emphasize her belief that whether a claim for equitable adoption can be recognized in this state should ultimately be resolved by the Illinois Supreme Court. *Id*. ¶¶ 55-58 (McDade, J., specially concurring).

¶ 15    Defendant filed a petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)), which we granted.

¶ 16                                    ANALYSIS

¶ 17    Before this court, defendant requests that the appellate court's decision be reversed in its entirety. She claims that plaintiff failed to set forth sufficient facts to state a cause of action with respect to each of his counts. She also argues that the attorney-client privilege should be applied to prevent the taking of attorney Peters' deposition in the event that any of plaintiff's counts survive.

¶ 18    As noted above, the circuit court dismissed plaintiff's second amended complaint in its entirety after defendant brought a section 2-615 motion to dismiss. Such a motion attacks the legal sufficiency of the complaint. *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 421 (2004). When ruling on a section 2-615 motion to dismiss, a court must accept as true all well-pleaded facts in the complaint, as well as any reasonable inferences that may arise from them. *Doe v. Chicago Board of Education*, 213 Ill. 2d 19, 28 (2004). Moreover, a cause of action should be dismissed under section 2-615 only if it is clearly apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to recover. *Bajwa*, 208 Ill. 2d at 421. The crucial inquiry is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action on which relief may be granted. *Bonhomme v. St. James*, 2012 IL 112393, ¶ 34. Our review of an order granting a section 2-615 motion to dismiss is *de novo*. *Id*.

¶ 19                         I. Lack of Testamentary Capacity

¶ 20    Every person who is at least 18 years old and is of "sound mind and memory has power to bequeath by will the real and personal estate which he has at the time of his death." 755 ILCS 5/4-1 (West 2010). Thus, it has long been established that to prevail in a will contest where the testator is of legal age, a plaintiff need only show that the will in question was the product of an unsound mind or memory. *American Bible Society v. Price*, 115 Ill. 623, 635 (1886). The standard test of testamentary capacity, *i.e.*, soundness of mind and memory, is that "the testator must be capable of knowing what his property is, who are the natural objects of his bounty, and also be able to understand the nature, consequence, and effect of the act of executing a will." *Dowie v. Sutton*, 227 Ill. 183, 196 (1907); see also *In re Estate of Sutera*, 199 Ill. App. 3d 531, 536 (1990). The absence of any one of these requirements would indicate a lack of testamentary capacity. *Dowie*, 227 Ill. at 196. Thus, if one is able to remember his property and understand the nature, consequences and effect of executing a will, but is incapable of knowing who the natural objects of his bounty are, he is not legally capable of making a will. *Dowie*, 227 Ill. at 196. The natural objects of one's bounty include

-5-

those people related to him by ties of blood or affection, and thus are those who are or should be considered to be recipients of his bequests. See *In re Estate of Roeseler*, 287 Ill. App. 3d 1003, 1013 (1997). It is also possible for testamentary capacity to be destroyed if one suffers from a mental delusion as to one of the objects of his bounty, even though he may recall other objects of his bounty on the face of the contested will. *Sterling v. Dubin*, 6 Ill. 2d 64, 76-77 (1955); *American Bible Society*, 115 Ill. at 636-38. Moreover, "[t]he specific name applied to describe that unsoundness, the means whereby the unsoundness was caused, or how it came about that the unsound mind and memory caused [the] writing to be drawn and signed, [are] matters of evidence that need not be alleged, and *** proved." *American Bible Society*, 115 Ill. at 635.

¶ 21   In the present case, we first note that plaintiff pled sufficient facts to establish that he was the natural object of Donald's bounty. In that regard, he alleged that (1) he was Donald's only son, (2) Donald had treated plaintiff throughout plaintiff's life as his son; (3) Donald acknowledged to numerous third parties that plaintiff was his son, including in May 2003, when he listed plaintiff as his son in Donald's prearranged funeral agreement; (4) Donald and Virginia gave plaintiff a birth certificate acknowledging that Donald was plaintiff's father, (5) even after plaintiff confronted Donald many years later about the birth certificate he was given, Donald insisted that he had adopted plaintiff, and (6) Donald had executed a prior will acknowledging plaintiff as his son and plaintiff's children as his grandchildren. Accepting these well-pled facts as true, we find that plaintiff should have been considered as a recipient of a bequest and was therefore a natural object of the testator's bounty.

¶ 22   In addition to alleging that plaintiff was the natural object of Donald's bounty, plaintiff also sufficiently alleged that Donald lacked the soundness of mind and memory at the time the contested will was executed to know plaintiff as his son. We believe that the appellate court correctly concluded that the fact that Donald stated in the will that he had "no children" when he spent over 60 years acknowledging plaintiff as his son leads to the reasonable inference that Donald had an unsound mind or memory at the time he executed the will. See 2012 IL App (3d) 090773, ¶ 18.

¶ 23   In opposition to this result, defendant relies on *George v. Moorhead*, 399 Ill. 497, 503 (1948), for the proposition that it is not necessary that the testator actually knew, or recalled, the natural object of his bounty, but whether he had the capacity to know it. But we find *George* to be easily distinguishable. In that case, the testator simply did not mention his two second cousins in his last will even though they were technically his next of kin. It was not clear whether the testator ever knew these distant cousins or how well he knew them. More importantly, in the present case, Donald made an affirmative declaration that he had "no children," which according to the well-pled allegations of the complaint, was completely inconsistent with his life history and prior declarations, thus raising the inference of an unsound mind or memory. There was no similar affirmative denial in *George*.

¶ 24   Defendant also argues that the complaint was insufficient to allege mental incapacity because the will, which was attached to the complaint, shows that Donald identified his wife and two sisters and made bequests to them in the will. Additionally the two attesting

witnesses to the will stated that Donald was of "sound mind."[1] We find defendant's arguments unpersuasive, however, because even though such matters may be strong evidence of testamentary capacity, they are not sufficient at this stage to negate plaintiff's well-pled allegations and prevent the case from proceeding forward. See *Sterling*, 6 Ill. at 73-77; *American Bible Society*, 115 Ill. at 636.

¶ 25      We therefore agree with the appellate court's conclusion that the circuit court erred in dismissing count I of plaintiff's second-amended complaint alleging a lack of testamentary capacity.

¶ 26      II. Undue Influence

¶ 27      We next turn to the count of plaintiff's complaint alleging undue influence. The leading case in Illinois addressing undue influence is *In re Estate of Hoover*, 155 Ill. 2d 402, 411-12 (1993), where this court stated as follows:

> "[U]ndue influence which will invalidate a will is ' "any improper *** urgency of persuasion whereby the will of a person is over-powered and he is indeed induced to do or forbear an act which he would not do or would do if left to act freely." [Citation.]' To constitute undue influence, the influence ' "must be of such a nature as to destroy the testator's freedom concerning the disposition of his estate and render his will that of another." ' [Citations.]

> What constitutes undue influence cannot be defined by fixed words and will depend upon the circumstances of each case. [Citation.] The exercise of undue influence may be inferred in cases where the power of another has been so exercised upon the mind of the testator as to have induced him to make a devise or confer a benefit contrary to his deliberate judgment and reason. [Citation.] Proof of undue influence may be wholly circumstantial. [Citation.] The influence may be that of a beneficiary or that of a third person which will be imputed to the beneficiary. [Citations.] False or misleading representations concerning the character of another may be so connected with the execution of the will that the allegation that such misrepresentations were made to the testator may present triable fact questions on the issue of undue influence. [Citations.]"

In *Hoover*, the question before this court was whether the trial court erred in granting summary judgment for the defendant beneficiary under a contested will. In that case, the

---

[1]Defendant suggests that because the will was attached to plaintiff's complaint, the attestation in the will that the testator was of "sound mind" should control over any conflicting allegations in the complaint. This is wrong for two reasons. First, plaintiff's claim is not founded on the will, as would be the case where, for example, a plaintiff brings a breach of contract claim and attaches the written contract to the complaint. When an exhibit is not an instrument upon which the claim or defense is founded, but is instead merely evidence supporting the pleader's allegations, the rule that the exhibit controls over conflicting averments in the pleading is not applicable. *Bajwa*, 208 Ill. 2d at 432. Second, the witnesses to the will only attested that the testator was of sound mind; there is no attestation that he was of "sound memory."

plaintiff alleged a "subtle, invidious kind of undue influence" in which the testator's will was overborne by a series of misrepresentations by the defendant about the plaintiff's character. *Id*. at 413. *Hoover* described the situation as a " 'secret influences' case," where the testator may act as if directed and guided by his own agency but that agency may have been overpowered by "secret influences." In such a case, a plaintiff may introduce circumstantial evidence to demonstrate that the influence was connected with and operative at the time of execution of the will and that the influence was directed toward procuring the will in favor of the beneficiary. *Id*. at 414. *Hoover* noted that there was evidence that the plaintiff, who was the son of the testator, had once held a very close relationship with his father and that his disinheritance had coincided with the misrepresentations of the defendant. *Id*. This court concluded that the case should be determined by a jury and that the appellate court had properly reversed the summary judgment order in favor of the defendant. *Id*. at 415.

¶ 28    Based on *Hoover*, we find that plaintiff in the present case has clearly alleged sufficient facts to survive a section 2-615 motion to dismiss. Similar to *Hoover*, plaintiff here has alleged sufficient facts indicating that he once had a close father-son relationship with Donald. The complaint alleges that they took a family vacation together within a couple of years prior to Donald's death that was paid for by Donald and that Donald made funeral arrangements indicating that he considered plaintiff his son in life and in death. Moreover, similar to *Hoover*, the instant complaint alleges a series of misrepresentations concerning plaintiff's character that occurred shortly before the execution of the will, which includes lies about telephone calls that were made and the interception and destruction of cards and letters. Under the circumstances, plaintiff has alleged sufficient facts to state a cause of action for undue influence.

¶ 29    Additionally, we note that the appellate court also found that plaintiff alleged sufficient facts to *allege* a presumption of undue influence. We agree with that observation. We note, however, that a presumption of undue influence is something that can only be ultimately determined—at the earliest—after the close of the plaintiff's case. See, *e.g.*, *In re Estate of Glogovsek*, 248 Ill. App. 3d 784, 798 (1993). Once the presumption is established, the defendant would then have the burden to rebut it. See *id*. at 791-92; *In re Estate of Henke*, 203 Ill. App. 3d 975, 979 (1990) (finding that the presumption was established at the close of the plaintiff's case, but then finding that once the burden of production was carried by the defendant to rebut it, it was then up to the trier of fact to weigh the evidence and decide the case).

¶ 30    It is well settled that a presumption of undue influence will arise under certain circumstances and one such circumstance is where (1) a fiduciary relationship exists between the testator and a person who receives a substantial benefit from the will, (2) the testator is the dependent and the beneficiary the dominant party, (3) the testator reposes trust and confidence in the beneficiary, and (4) the will is prepared by or its preparation procured by such beneficiary. *Herbolsheimer v. Herbolsheimer*, 60 Ill. 2d 574, 577 (1975); *Weston v. Teufel*, 213 Ill. 291, 299 (1904). Proof of these facts standing alone and undisputed by other proof entitles the contestant of a will to a verdict (*Weston*, 213 Ill. at 299), but the presumption can be rebutted if there is strong enough evidence in contradiction (see *Henke*, 203 Ill. App. 3d at 979-80).

¶ 31    Here, the complaint alleged that defendant held Donald's power of attorney. As a matter of law, a power of attorney gives rise to a general fiduciary relationship between the grantor and the grantee. See *Simon v. Wilson*, 291 Ill. App. 3d 495, 503 (1997). The complaint further alleged that although defendant and Donald had been married for less than a year and he had amassed his fortune over an 84-year period, Donald placed considerable assets in joint tenancy with defendant. The complaint also alleges that she attempted to exercise significant control over Donald's real estate dealings and claimed the right to act on his behalf and in his stead with respect to his Illinois farm. Donald was an elderly man in his mid-80s, while defendant was 29 years younger. These factual allegations are sufficient to plead that defendant gained a position of trust and confidence and was the dominant party such that she was in a position to control Donald's will.

¶ 32    Finally, we also note that there were sufficient facts pled to infer that defendant procured preparation of the will that disinherited plaintiff. The complaint alleges that defendant accompanied Donald to the law office of the attorney that prepared the will. It also alleges that she repeatedly told Donald and reinforced in his mind that he did not have any children and the son he had held out for decades was not his child. The complaint also alleges that prior to their one-year anniversary, defendant demanded that Donald execute the will that stated that he had no children, and that the will was the product of defendant's undue influence.

¶ 33    Defendant relies upon *In re Estate of Glogovsek* to argue that a presumption of undue influence can never be applied to a spouse of a testator. We consider *Glogovsek* to be instructive, but find that it does not support defendant's position. *Glogovsek* merely held, and we agree, that "the use of the presumption of undue influence must be applied with caution as to marital relationships." *Glogovsek*, 248 Ill. App. 3d at 790. The court refused to apply the presumption under the facts of that particular case, but did not rule that the presumption could never be applied when the defendant beneficiary was a spouse. *Glogovsek* is clearly distinguishable and actually supports our holding that the undue influence count should be allowed to proceed in this case.

¶ 34    In *Glogovsek*, the court found it significant that the parties had been married 34 years and that there was no evidence that the wife managed money or property that belonged solely to her husband. There was also no evidence that any of the husband's nonmarital property was placed in joint tenancy with the wife. *Glogovsek* found it most significant, however, that the first prong of the presumption requires a fiduciary relationship between the testator and a person who receives a substantial benefit under the will *compared to other persons who have an equal claim to the testator's bounty*. *Id*. at 794.

¶ 35    In *Glogovsek*, the wife as beneficiary clearly had a superior claim to that of the plaintiffs in that case, who were not descendants of the testator, but were rather his siblings and nieces. *Glogovsek* explained that the laws of testacy and intestacy favor a spouse over relatives that are not descendants of the decedent. *Id*. This is because if a person dies without a will and without descendants, the entire estate goes to the spouse, but if there is a descendent left, one half goes to the surviving spouse and one-half goes to the descendant. See 755 ILCS 5/2-1(a) (West 2010). And if a person has left insufficient or no provision for his spouse through a will, the surviving spouse can renounce the will and is then entitled to one-half of the estate

if there is no descendent, but the surviving spouse is only entitled to one-third if the testator leaves a descendent. 755 ILCS 5/2-8(a) (West 2010). Here, plaintiff's complaint alleges that he is Donald's son and therefore his descendant. Thus, accepting as true this well-pled fact, plaintiff in this case, in contrast to the plaintiffs in *Glogovsek*, actually has *an equal or superior* claim to that of the spouse.

¶ 36    This case is also distinguishable from *Glogovsek* because Donald was married to defendant less than one year at the time the will was executed and a little more than a year at the time of his death, whereas the testator and the spouse in *Glogovsek* were married for 34 years. Additionally, the instant case is currently before us on a section 2-615 motion to dismiss, which merely attacks the legal sufficiency of the complaint. But *Glogovsek* was resolved after a full bench trial where all the evidence was presented. Only then did the appellate court determine that there was no evidence presented that the testator had entrusted his financial affairs to his wife or that she had managed his money or property. Here, in contrast, there are ample allegations to indicate that defendant managed Donald's financial affairs and that a fiduciary relationship was created. Thus, *Glogovsek* does not support the notion that the 2-615 dismissal was proper in this case.

¶ 37    For all of the reasons stated above, we find that plaintiff has alleged sufficient facts to state a cause of action for undue influence. We therefore affirm the appellate court on this count.

¶ 38                  III. Tort Claims of Fraudulent Inducement and
                            Interference With Expectancy

¶ 39    We now turn to plaintiff's two tort claims of fraud in the inducement and tortious interference with economic (or testamentary) expectancy. To constitute fraud in the inducement, the defendant must have made a false representation of material fact, knowing or believing it to be false and doing it for the purpose of inducing one to act. See *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1006 (2010). The misrepresentations or false statements must be shown to have caused the testator to execute the contested will. *Hoover*, 155 Ill. 2d at 417. To recover for tortious interference with an economic expectancy, the plaintiff must establish the following: (1) the existence of his expectancy; (2) defendant's intentional interference therewith; (3) tortious conduct such as undue influence, fraud or duress; (4) a reasonable certainty that the expectancy would have been realized but for the interference; and (5) damages. *In re Estate of Roeseler*, 287 Ill. App. 3d at 1021. A will contest is distinct from a tort action for intentional interference with testamentary expectancy. One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he otherwise would have received is subject to liability to the other for the loss. *In re Estate of Ellis*, 236 Ill. 2d 45, 52 (2009). The remedy is not the setting aside of the will, but a judgment against the individual defendant, which would include money damages for the amount of the benefit tortiously acquired. *Id*.

¶ 40    Here, plaintiff has properly alleged sufficient facts to meet a *prima facie* case for both torts, with the exception of the damages element, which can only be known if it exists after resolution of the first two claims contesting the will. Plaintiff's complaint as to both tort

-10-

counts realleges the allegations made in connection with the first two counts of the complaint that contest the will, and we have already determined that undue influence has been sufficiently alleged. Additionally, the tort claims allege that defendant told Donald either that (1) plaintiff was dead, (2) Donald's adoption of plaintiff did not make plaintiff his son, or (3) the adoption was not legally binding. Moreover, it is alleged that had it not been for all of the misrepresentations, Donald would not have disinherited plaintiff, but would have made no provision in the will for defendant had he realized the fraud. It is also alleged that a prior will existed which provided for plaintiff as Donald's son, but that defendant secreted or destroyed this prior will. All together, this is more than enough to sufficiently allege a cause of action for both tort counts, except for the element of damages.

¶ 41    With respect to the element of damages, the tort claims are premature because the will contest remains a viable cause of action on remand. If plaintiff is able to succeed on his claims contesting the will on remand, the dismissal of his tort counts would then be appropriate because the adequacy of the probate relief would be undisputed and there would therefore be no damages in tort. *Roeseler*, 287 Ill. App. 3d at 1021-22. If plaintiff fails in his will contest on remand in the probate court, however, he would then be able to proceed against defendant on his tort claims in that same court. See 2012 IL App (3d) 090773, ¶¶ 32-34; *Roeseler*, 287 Ill. App. 3d at 1021-22; *In re Estate of Jeziorski*, 162 Ill. App. 3d 1057, 1064 (1987) (by allowing the plaintiffs during the probate proceedings to present evidence regarding their tort claims, a further collateral attack on the probate decree in a later tort action in the law division would not be required; the trial court can hear all the evidence in one proceeding). Accordingly, we find that the appellate court correctly determined that dismissal of the tort counts of the complaint was premature.

¶ 42                              IV. Contract to Adopt

¶ 43    We next address the count of plaintiff's complaint alleging that a contract for adoption existed and plaintiff should therefore be considered an heir of Donald's estate under Illinois case law. Defendant argues that for this theory to be established there must be proof that a contract for adoption was entered into between the foster parent and the child's natural parents or some individual or institution standing *in loco parentis*, and the natural parents must "give up" custody. Defendant maintains that plaintiff's complaint is deficient because it does not allege who the parties to the agreement were. Plaintiff in turn relies upon this court's decision in *Monahan v. Monahan*, 14 Ill. 2d 449 (1958), to contend that sufficient facts were alleged to state a cause of action. We agree with plaintiff.

¶ 44    In *Monahan*, the plaintiff's natural mother boarded her son with the Monahans when he was two years old. The plaintiff's natural father abandoned him a year later and was never seen again. The plaintiff's mother continued to pay board for another four years, but then apparently gave up the plaintiff to the Monahans and consented to his adoption. This was shown by notations that Mrs. Monahan had made to papers found among her personal effects after her death. The Monahans then raised the boy as their own, had him baptized as Edward Francis Monahan, and consulted an attorney about adoption when he was seven years old. The adoption never took place, however, because the Monahans mistakenly believed that

they needed the natural father's consent to proceed and were unable to locate him. The Monahans entered the plaintiff into school as their adopted son, continuously referred to him as their son and themselves as "mom and dad," and many of their relatives were under the impression that the plaintiff was adopted.

¶ 45 This court in *Monahan* found that a contract to adopt did exist. *Id*. at 453. In so doing, this court reconciled its earlier decision in *Weiss v. Beck*, 1 Ill. 2d 420 (1953), stating that there, the court merely determined that the evidence presented failed to give rise to a "clear, positive indication that the agreement to adopt ever existed, but left reasonable doubt, and harmonized as readily with the intention to provide a good home as with an intent to adopt." *Monahan*, 14 Ill. 2d at 453. The *Monahan* court continued, stating that "[c]ertainly a contract to adopt, as any other fact, may be proved by circumstantial evidence, provided that evidence meets the requisite tests of sufficiency." *Id*. *Monahan* then found that the evidence of a contract as well as the intention to adopt the plaintiff is "clear and convincing" based on the following evidence. *Id*. The family relationship of parents and son clearly existed, neighbors and relatives believed the plaintiff had been adopted, and the plaintiff conducted himself as a dutiful child. Moreover, the Monahans indicated to others that the plaintiff's natural mother "gave" the plaintiff to them to adopt and this was confirmed by written notations, along with their abortive attempts at legal adoption. *Id*.

¶ 46 We find that *Monahan* compels the result that sufficient facts were pled in the present case to allege a claim for a contract to adopt. In *Monahan*, the court found that the contract-for-adoption claim was proven by "clear and convincing" evidence at trial. Here, plaintiff is not required to prove his case at the pleading stage by clear and convincing evidence. Instead, he needed only to allege sufficient facts to support his conclusion that a contract to adopt existed.

¶ 47 Defendant incorrectly argues that Donald failed to allege the identity of the parties to the contract for adoption. The instant appellate court correctly found that the well-pled facts, viewed in the light most favorable to plaintiff, sufficiently inferred that a contract to adopt existed between Donald and plaintiff's mother Virginia and that plaintiff was a third-party beneficiary of that contract. See 2012 IL App (3d) 090773, ¶ 42. In that regard, plaintiff's complaint specifically alleges that Donald "had agreed with Virginia to keep the adoption a secret for the good of [plaintiff] and the family." And "[a]s part of this agreement, the two agreed to celebrate their wedding anniversary, but never discuss how many years they had been married." We believe that implicit in the agreement to "keep the adoption a secret" is an agreement between Virginia and Donald that Donald adopt plaintiff.

¶ 48 In an adoption where a spouse adopts the natural child of his or her spouse, it is not necessary that the spouse giving up the child for adoption to the other spouse actually give up his parental rights. In such a case, an agreement for adoption exists even though the natural parent is not giving up all—or even any of—his parental rights. At any rate, it can be readily inferred from the allegations of plaintiff's complaint that Virginia in agreeing to allow Donald to adopt plaintiff conferred the full benefits of fatherhood upon him and relinquished some of her control of the child to plaintiff. See, *e.g.*, *Lee v. Bermingham*, 199 Ill. App. 497, 507-08 (1916). We also think it obvious that mutual consideration exists for such an agreement, and defendant has not supported her claim that consideration is lacking with any

relevant citation to Illinois authority. Further support for the claim that a contract for adoption existed is the well-pled fact that Donald had hired an attorney in Homewood to complete the adoption and that Donald believed it had actually been completed, telling plaintiff that it was "all legal."

¶ 49 Defendant is also mistaken in her assertion that plaintiff cannot proceed on a contract to adopt theory in this case where there is no evidence that plaintiff's natural father (who abandoned plaintiff) was a party to an agreement with Donald for an adoption. We find no merit to defendant's contention that a party who has permanently abandoned a child need be a party to the contract to adopt that is being enforced for inheritance purposes. The natural father in *Monahan* also abandoned the plaintiff in that case when he was a small child and there was no evidence that he ever consented to adoption, but this fact did not preclude the plaintiff from prevailing in that case. See *Monahan*, 14 Ill. 2d at 450, 453. In sum, we conclude that the appellate court correctly determined that the circuit court erred in dismissing plaintiff's adoption contract claim.

¶ 50                                        V. Equitable Adoption

¶ 51 As an alternative to his contract for adoption theory, plaintiff relies upon the theory of equitable adoption. Plaintiff suggests that even in the absence of an expressed or implied contract to adopt, a finding of an equitable adoption would nonetheless be proper in a case where there is clear and convincing evidence of a foster parent's intent to adopt and treat the child as one's adopted or natural child. Defendant, on the other hand, argues that any recognition of equitable adoption should be limited to situations where a contract to adopt exists and the natural parent gives up his or her child.

¶ 52 We note that the concept of "equitable adoption" is somewhat murky because many states seem to equate the theory of equitable adoption with a contract-to-adopt theory. See *In re Estate of Edwards*, 106 Ill. App. 3d 635, 637 (1982); *In re Estate of Staehli*, 86 Ill. App. 3d 1, 5-6 (1980); see also Tracy Batemen Farrell, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel*, 122 A.L.R.5th 205, § 3(a) n.47 (2004). In these states, it is clear that where the doctrine of "equitable adoption" is recognized, the most important prerequisite to its application is proof that a contract of adoption was entered into between the foster parents and the natural parents or someone standing *in loco parentis*. See *id*. § 2(a). These jurisdictions apply estoppel or quasi-contract considerations where there has been clear proof of a contract, expressed or implied, reliance upon the parent-child relationship, and performance of obligations under the *de facto* relationship. See *Edwards*, 106 Ill. App. 3d at 637. This makes so-called equitable adoption, as recognized in many states, essentially indiscernible from the Illinois cases involving a failure to follow the statute for adoption that have proceeded on a contract theory. *Cf. Monahan*, 14 Ill. 2d at 452-54; *Dixon National Bank of Dixon, Illinois v. Neal*, 5 Ill. 2d 328, 334 (1955); *Franzen v. Hallmer*, 404 Ill. 596, 604 (1950); *Soelzer v. Soelzer*, 382 Ill. 393, 399-400 (1943); *Winkelmann v. Winkelmann*, 345 Ill. 566, 574 (1931); *In re Estate of Edwards*, 106 Ill. App. 3d 635, 637 (1982); *Lee*, 199 Ill. App. at 501-02; *In re Estate of Drisch*, 112 Ill. App. 2d 242, 248-50 (1969); *Robbins v. Millikin National Bank of Decatur*, 334 Ill. App. 190, 194 (1948).

¶ 53    A few states, however, have refused to apply a steadfast requirement that an expressed or implied contract to adopt exists before finding that an equitable adoption has occurred. See, *e.g.*, *Estate of Ford v. Ford*, 82 P.3d 747, 754 (Cal. 2004); *Wheeling Dollar Savings & Trust Co. v. Singer*, 250 S.E.2d 369, 373-74 (W. Va. 1978). In *Wheeling*, the Supreme Court of West Virginia declined to take the view that an expressed or implied contract to adopt was absolutely necessary to establish that an equitable adoption had taken place where a person has "stood from an age of tender years in a position *exactly* equivalent to a formally adopted child." (Emphasis added.) *Id*. The court stated that while the existence of an expressed or implied contract of adoption is "very convincing evidence, an implied contract of adoption is an unnecessary fiction created by courts as a protection from fraudulent claims." *Id*. The court held that "if a claimant can, by clear, cogent and convincing evidence, prove sufficient facts to convince the trier of fact that his status is identical to that of a formally adopted child, except only for the absence of a formal order of adoption, a finding of an equitable adoption is proper without proof of an adoption contract." *Id*. at 374. The court noted that circumstances that tend to show the existence of an equitable adoption include the following: the benefits of love and affection accruing to the adopting party; the performances of services by the child; the surrender of ties by the natural parent; the society, companionship and filial obedience of the child; an invalid or ineffectual adoption proceeding; reliance by the adopted person upon the existence of his adopted status; the representation to all the world that the child is a natural or adopted child; and the rearing of the child from an age of tender years by the adopting parents. *Id*. at 373-74.

¶ 54    In *Ford*, the California Supreme Court also concluded that an equitable adoption claimant need not prove all of the elements of an enforceable contract to recover. *Ford*, 82 P.3d at 754. *Ford*, however, employed a stricter approach than the one adopted by the West Virginia Supreme Court in *Wheeling*. *Ford* held that to prove an equitable adoption, a claimant "must demonstrate the existence of some direct expression, on the decedent's part, of an intent to adopt the claimant." *Id*. The court found that this intent may be shown by an unperformed agreement or promise to adopt, but that it also may be shown by "proof of other acts or statements directly showing that the decedent intended the child to be, or to be treated as, a legally adopted child, such as an invalid or unconsummated attempt to adopt, the decedent's statement of his or her intent to adopt, the child, or the decedent's representation to the claimant or to the community at large that the claimant was the decedent's natural or legally adopted child." *Id*. *Ford* also held that along with a statement or act by the decedent evincing an unequivocal intent to adopt, the claimant must also show "the decedent acted consistently with that intent by forming with the claimant a close and enduring familial relationship." *Id*. In other words, there must be objective conduct indicating mutual recognition of a parent-child relationship to such an extent that in equity and good conscience an adoption should be deemed to have taken place. *Id*. *Ford* strongly cautioned, however, that it would not recognize estoppel arising merely from a familial relationship between the decedent and the claimant without any direct expression by the decedent of an intent to adopt the child or to have him treated as a legally adopted child. *Id*. at 753.

¶ 55    Applying the above-mentioned principles along with a "clear and convincing" burden of proof, *Ford* examined all of the evidence presented in the case before it and concluded that

-14-

an equitable adoption had not been proven even though the claimant had a close and enduring familial relationship with the decedent, Mr. Ford. *Id*. at 755. The court noted that there was no evidence that the Fords ever made an attempt to adopt the claimant and they never held him out to the world as their natural or adopted son, nor represented to him that he was their child, even though the claimant called them "Mom" and "Dad." It was also noted that Mrs. Ford's single statement to a family friend that she wanted to adopt claimant, but was under the impression that she could not do so while he was still in the home, was deemed insufficient evidence that Mr. Ford intended claimant to be adopted. *Id*.

¶ 56 Although no Illinois court has expressly recognized the concept of equitable adoption as it is presented here, no Illinois court has expressly rejected it either. We do find, however, that the underpinnings to pave the way for its recognition can be found in this court's earlier decisions of *Monahan* and *Weiss*. Both cases were brought purely under a contract-to-adopt theory, and there was no argument presented by the parties that this court should recognize equitable adoption in any form. Both decisions, however, addressed arguments that a contract to adopt could be proven by circumstantial evidence, and in the course of addressing that argument, both courts cited approvingly to the Eight Circuit Court of Appeals decision in *Roberts v. Roberts*, 223 F. 775 (8th Cir. 1915), which, even though it did not expressly address equitable adoption, seemed to ultimately rest its outcome on principles of equity.

¶ 57 In *Roberts*, there was no evidence of a contract to adopt, but plaintiff nonetheless proceeded under a contract-to-adopt theory. *Id*. at 776-77. The evidence did show that the foster parents took the plaintiff into their home at a young age, they gave her their own surname, and they baptized her using that surname. Thereafter, they treated her as their natural child. It was not until plaintiff was an adult that she was ever permitted to know that her foster parents were not her natural parents. This fact was then only revealed to the plaintiff by her foster mother on her deathbed. There was also evidence that the foster parents had stated, both orally and in writing, that they had adopted plaintiff. The court inferred from the circumstances that an agreement for adoption "must have existed" even though there was no direct evidence of it and all the parties that would have known about it were deceased. *Id.*

¶ 58 We note that despite the constraints of being a contract-to-adopt case, *Roberts* seems to rest more on equitable principles of fairness and intent rather than the ordinary rules of contract law. In that regard, it found applicable language from a Missouri Supreme Court case, which stated in part as follows:

> " 'The life of that whole family in reference to this child, from the time she was first taken into it until the death of Mr. Lynn, would have to be construed to be a deception and a fraud, if we would give to it the effect that respondents claim for it. *** Like a bud that has been cut from its natural stem and grafted into a foreign tree, she grew into the family and became a part of its very life. Everything that adoption contemplates was accomplished.' " *Id*. at 776 (quoting *Lynn v. Hockaday*, 61 S.W. 885, 889 (Mo. 1901)).

Again, both *Weiss* and *Monahan* cited *Roberts* with approval, albeit to support the notion that a contract to adopt can be shown by circumstantial evidence, with *Weiss* discussing it at length. We find that *Roberts* supports the position that in Illinois an equitable adoption

theory should be recognized under the right circumstances even in the absence of a statutory adoption or a contract for adoption.

¶ 59    The question remaining is under what circumstances should an equitable adoption theory be recognized. We believe that the California Supreme Court struck the proper balance in *Ford*, and therefore adopt its holding here. We do not believe it sufficient merely to prove that a familial relationship existed between the decedent and the plaintiff. Nor do we deem it sufficient to show, as *Wheeling* held, that the plaintiff merely demonstrate that from an age of tender years, he held a position exactly equivalent to a statutorily adopted child. Rather, we hold that a plaintiff bringing an equitable adoption claim must prove an intent to adopt along the lines described in *Ford* and, additionally, must show that the decedent acted consistently with that intent by forming with the plaintiff a close and enduring familial relationship.

¶ 60    We note that *Ford* found that it could be possible to prove intent by showing that the decedent represented to the plaintiff and the community at large that the plaintiff was the decedent's "*natural* or legally adopted child." (Emphasis added.) *Ford*, 82 P.3d at 754. Our holding is couched in terms of an "intent to adopt" and the allegations of the complaint in the present case have certainly alleged that much. But we envision a case where, like *Roberts* and similar to the present case, a decedent had held out the plaintiff his whole life as his or her natural child, never even letting it be known throughout the childhood of the plaintiff that the child was not the natural offspring of the deceased. We believe that in such cases there is every bit as much equitable justification for finding an equitable adoption as in cases where the plaintiff was merely incorrectly held out as the legally adopted child. We believe that to not recognize an equitable adoption in such cases would work a "deception and a fraud" and would be contrary to the decedent's intent to treat and continuously hold out the plaintiff as his or her natural child.

¶ 61    Defendant argues that recognizing the theory of equitable adoption in the absence of a contract to adopt will have detrimental, unintended consequences. She contends that a person who does not take any affirmative action to become a parent—whether through birth, adoption or contract to adopt—but who is nonetheless kind and compassionate to a child, should not be deemed to confer legal rights to that person as an heir.

¶ 62    We believe that all of these concerns are allayed by the limited nature of our holding—only in those cases where there is sufficient, objective evidence of an intent to adopt (or fraudulently or mistakenly holding out as a natural child on a continual basis), supported by a close enduring familial relationship, will an equitable adoption be recognized. The narrow nature of our holding forecloses claims against the estate of *any* foster parent or stepparent who merely treats a foster or stepchild lovingly and on an equal basis with his or her natural or legally adopted children.

¶ 63    Finally, we consider the quantum of evidence needed to prove an equitable adoption claim. Most courts to have considered the issue require clear and convincing evidence to prove an equitable adoption. *Ford*, 82 P.3d at 549. We note that in the context of proving a contract-to-adopt claim, this court has found that the existence of a contract must be "clear and conclusive of the existence and terms of the contract, leaving no room for reasonable

doubt." *Monahan*, 14 Ill. 2d at 452. The court will "weigh the evidence scrupulously and with caution." *Id*. Moreover, the evidence must be "strong and compelling [and not] readily harmonizable with any other theory" such as with the mere intention to provide a good home as opposed to the intent to adopt. *Id*. at 452-53. There are a number of valid reasons to apply an analogous, but similarly demanding, standard of proof to equitable adoption claims.

¶ 64    First, and foremost, equitable adoption cases in the inheritance context deal with deceased persons who can no longer testify as to their intent. When the lips of a deceased person who is alleged to have intended an adoption are sealed by death, proof of the facts necessary to invoke principles of equity should be clear, unequivocal and convincing. See *Cavanaugh v. Davis*, 235 S.W.2d 972, 978 (Tex. 1951). Second, if too lax a standard were created it could create a danger that a person could not take in a child in need without having a *de facto* adoption perpetrated upon him after his death. *Ford*, 82 P.3d at 550. "[I]f the evidentiary burden is lowered too far, 'then couples, childless or not, will be reluctant to take into their homes orphan children, and for the welfare of such children, as well as for other reasons, the rule should be kept and observed. No one, after he or she has passed on, should be adjudged to have adopted a child unless the evidence is clear, cogent, and convincing.' " *Id*. (quoting *Benjamin v. Cronan*, 93 S.W.2d 975, 981 (Mo. 1936)).

¶ 65    Accordingly, we find that a plaintiff must prove an equitable adoption claim to recover against an estate by clear and convincing evidence. Moreover, the decedent's intent to adopt and form a close and enduring familial relationship must be clear and conclusive. And it must not be just as readily harmonizable with the mere intention to provide a good home, but must instead indicate a clear intent to adopt or to continuously represent to the plaintiff and the world at large that the plaintiff was the decedent's natural child.

¶ 66    In sum, we affirm the result of the appellate court in finding that plaintiff could proceed on count VI of his complaint under an equitable adoption theory and that plaintiff has alleged sufficient facts to avoid dismissal under section 2-615 of the Code. We note, however, that the appellate court's analysis appears to have rested on the belief that, as is the case in many states, an agreement for adoption must always be alleged to support an equitable adoption theory. See 2012 IL App (3d) 090773, ¶¶ 45-46. Accordingly, we affirm the result reached by the appellate court on count VI, but reject its reasoning requiring proof of a contract.

¶ 67                              VI. Motion to Compel Deposition

¶ 68    Finally, we note that the appellate court reversed the trial court's denial of plaintiff's motion to compel the deposition of the attorney who drafted the contested will, but remanded to the trial court for a determination on whether the attorney-client privilege might apply so as to prevent the deposition. In so doing, the appellate court found that plaintiff, as " '[t]he party seeking disclosure from an attorney[,] [would have] the burden of establishing that the attorney-client privilege does not apply.' " See 2012 IL App (3d) 090773, ¶ 50 (quoting *Hitt v. Stephens*, 285 Ill. App. 3d 713, 717 (1997)).

¶ 69    We note that generally the attorney-client privilege survives the client's death. See *Hitt*, 285 Ill. App. 3d at 717; Paul R. Rice, Attorney-Client Privilege in the United States § 2:5, at 69 (1993). A different rule applies, however, with respect to a will. In such a case, there

is only a temporary privilege. *Dickerson v. Dickerson*, 322 Ill. 492, 500 (1926). Where an attorney prepares a will for a client and witnesses the same, the privilege only exists during the lifetime of the client. *Id.* The rationale behind this limited exception to the privilege is that a decedent would (if one could ask him) forgo the privilege so that the distribution scheme he actually intended can be given effect. *Hitt*, 285 Ill. App. 3d at 717-18; see also *Glover v. Patten*, 165 U.S. 394, 406-08 (1897); Paul R. Rice, Attorney-Client Privilege in the United States § 2:5, at 70 (1993).

¶ 70 Defendant acknowledges that there is an exception to the attorney-client privilege for a will contest, but argues that the exception or waiver of the privilege is only in favor of those claiming through the decedent in a dispute between the executor and the decedent's heirs or next of kin. See *Wilkinson v. Service*, 249 Ill. 146, 150-51 (1911). Defendant maintains that there was no evidence presented that plaintiff was an heir or next of kin. Defendant characterizes plaintiff as a "complete stranger" to this will contest and argues that plaintiff needs to satisfy a higher threshold of showing that he is an heir or next of kin before he can use the court to discover confidences to which he is not entitled.

¶ 71 Plaintiff in response notes that the appellate court remanded to allow plaintiff to "prove that the privilege does not apply in this case." See 2012 IL App (3d) 090773, ¶ 50. Plaintiff points out, however, that the appellate court did not elaborate on what his showing must be, though it relied upon *Hitt*. Plaintiff further argues that he is not a "stranger" for purposes of the privilege, given that Donald recognized him as a son throughout his lifetime. He also suggests that the fact that he was a recipient under a prior will should be valid cause for waiver of the privilege.

¶ 72 It is true that the appellate court did not elaborate on what plaintiff must show on remand. It did cite *Hitt* for the proposition that the party seeking disclosure has the burden of establishing that the privilege does not apply. *Hitt* in turn cited this court's decision in *In re Marriage of Decker*, 153 Ill. 2d 298, 321 (1992), for this proposition. *Decker* involved the crime-fraud exception to the attorney-client privilege. *Id. Decker* did consider the kind of burden a party must meet to prove that certain communications fall within the exception to the privilege, noting that it " 'would be absurd to say that the privilege could be got rid of merely by making a charge of fraud.' " *Id.* (quoting *Clark v. United States*, 289 U.S. 1, 15 (1933)). *Decker* noted that *Clark* found that there must be something to give color to the charge; there must be *prima facie* evidence that has some foundation in fact. *Clark*, 289 U.S. at 15.

¶ 73 Applying the above-mentioned principles to the present case, we find that plaintiff need only make an initial evidentiary showing that he is an heir or next of kin or that he was a recipient under a prior will. Any of these showings would make him an interested person and not a stranger subject to the limitations of the attorney-client privilege. In this particular case, we find this is indisputably a will contest, involving claims of testamentary capacity and undue influence. Moreover, plaintiff has nearly made the showing that he is an heir or next

of kin for purposes of the exception to the privilege,[2] if in fact he has not already made it. Here, plaintiff alleges that he is Donald's equitably adopted son and that he was considered Donald's son throughout much of both of their lifetimes. Plaintiff has documentary evidence in the record to support this in the form of the birth certificate given to him by Donald that lists Donald as plaintiff's natural father. This birth certificate is attached to the second amended complaint as exhibit B. The record also contains the affidavit of Cheryl Anderson, the deputy clerk for the City of Harvey, Illinois, which appears to vouch for the authenticity of that birth certificate as a copy of an original issued by the City of Harvey. Thus, it appears that plaintiff will be able to make out a *prima facie* case on remand that the attorney-client privilege does not apply because it is subject to the will-contest exception. It would then be up to defendant to rebut plaintiff's *prima facie* case on remand. If she is unable to do so, the trial court should compel the deposition of attorney Peters.

¶ 74    Accordingly, we hold that the appellate court correctly reversed the circuit court's denial of the motion to compel and properly remanded the cause to the circuit court for an evidentiary hearing on the matter.

¶ 75                                    CONCLUSION

¶ 76    For the reasons set forth above, we conclude that plaintiff's second amended complaint alleged sufficient facts to state a cause of action for lack of testamentary capacity, undue influence, contract for adoption and equitable adoption. We further find that dismissal of the two tort claims at this point was premature. The appellate court therefore properly reversed the circuit court's dismissal of each of the six counts of the second amended complaint. We further conclude that the appellate court properly reversed the circuit court's denial of plaintiff's motion to compel the deposition of attorney Peters. Accordingly, we affirm the judgment of the appellate court in its entirety, which remanded the cause to the circuit court of Will County for further proceedings.

¶ 77    Appellate court judgment affirmed.

---

[2]We underscore that we mean for purposes of the exception to that attorney-client privilege only, and we do not mean to suggest that plaintiff had demonstrated that he is an equitably adopted son for purposes of count VI of the second amended complaint. That count is of course subject to the clear and convincing evidence standard discussed above. With respect to the motion to compel the deposition, however, plaintiff is only required to make some initial evidentiary showing that he is an heir or next of kin or that he was a recipient under a prior will.