NOTICE
Decision filed 06/12/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250501

NO. 5-25-0501

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* ESTATE OF EDWIN L. TICKNOR JR., Deceased | ) ) ) | Appeal from the Circuit Court of Marion County. |
| (Kevin Ticknor, | ) ) | |
| Petitioner-Appellant, | ) ) | |
| v. | ) ) | Nos. 22-PR-56 |
| Georgia L. Bumgarner, as Executrix of the Estate of Edwin L. Ticknor Jr., Deceased, and Individually, and Kjay Bumgarner, | ) ) ) ) | Honorable |
| Respondents-Appellees). | ) ) | Mark W. Stedelin, Judge, presiding. |

JUSTICE BOLLINGER delivered the judgment of the court, with opinion.
Presiding Justice Cates and Justice Boie concurred in the judgment and opinion.

**OPINION**

¶ 1 Petitioner Kevin Ticknor (Kevin), the son and only child of Edwin Ticknor (Eddie), challenged Eddie's will, which explicitly disinherited Kevin and left all of his property and possessions to Georgia L. Bumgarner (Georgia), who was also listed as executrix, and her adopted daughter, Kjay Bumgarner (Kjay). Alternatively, Kevin sought to bar Georgia and Kjay from receiving any benefit from Eddie's estate and for money damages and attorney's fees. Georgia, Kjay, and Georgia's husband, Ralph, were named as respondents. As a basis to set aside the will, Kevin claimed that Eddie lacked testamentary capacity and that respondents engaged in undue

1

influence over Eddie. In the alternative to setting aside the will, Kevin alleged that respondents financially exploited Eddie, an elderly or disabled person, pursuant to section 2-6.2 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/2-6.2 (West 2022)) and section 17-56(g) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/17-56(g) (West 2022)). After a bench trial, the trial court found that Kevin had not met his burden of proof as to any of his claims. Kevin now appeals, asserting that the trial court erred in finding that Eddie did not lack testamentary capacity, in finding that Eddie was not dependent on Georgia, in failing to apply an adverse inference when Georgia failed to call the attorney who drafted the will as a witness, in failing to apply the common-law presumption of fraud to the financial exploitation count, and in finding that Eddie was not financially exploited. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3       On June 23, 2022, Eddie died testate. His will was dated May 4, 2018, and had as its sole beneficiaries Georgia, who was also listed as executrix, and her daughter, Kjay. Georgia's husband, Ralph Bumgarner (Ralph), was named as successor executor under the will. Kevin, Eddie's only child, was explicitly excluded from Eddie's will. Eddie, who had thrice divorced prior to his death, had no spouse. The will was admitted to probate on August 5, 2022, and Georgia was appointed executrix.

¶ 4       On January 19, 2023, Kevin filed a three-count petition for will contest. Count I alleged that Eddie lacked testamentary capacity at the time he executed his will. Count II alleged that Georgia, Kjay and Ralph had exerted undue influence over Eddie to execute his will. Count III was filed in the alternative to counts I and II. Count III alleged that, to the extent the will is valid, any bequests and devises to respondents should be held void on the basis of financial exploitation of Eddie, an elderly or disabled adult, as defined by section 2-6.2 of the Probate Act. On July 21,

2023, the trial court granted Georgia's motion to dismiss count III of Kevin's petition without prejudice due to insufficient factual pleadings. On August 15, 2023, Kevin filed an amended count III of his petition. The amended count III additionally alleged financial exploitation of Eddie pursuant to section 17-56(g) of the Criminal Code and requested that Georgia and Kjay be barred from receiving any benefit from Eddie's estate, that Georgia be removed as executor, and that judgment be entered against Georgia in the amount of three times the amount unlawfully received by Georgia and her family and for attorney fees. Georgia filed a response to all three counts.

¶ 5   On November 1, 2024, Kevin filed a motion requesting that the trial court make a pretrial determination that Georgia has the burden of proof by clear and convincing evidence that the execution of the will and the alleged financial transactions benefitting her and Kjay were fair and equitable and not the result of undue influence. He argued that Georgia was a fiduciary to Eddie, based on the execution of two powers of attorney on April 26, 2018, appointing her as his agent and based on her deposition testimony that he placed "trust, faith, confidence and reliance" on her. At the hearing on the motion, Kevin's attorney argued that a presumption of fraud applied to counts II and III of the petition. The trial court declined to rule that the presumption applied to those counts and indicated that it needed to hear further facts at trial to decide whether the presumption was applicable.

¶ 6   The bench trial commenced, proceeding initially with the admission of the transcript of the December 16, 2022, hearing for formal proof of will pursuant to section 6-21 of the Probate Act. See 755 ILCS 5/6-21 (West 2022). Within that transcript was the testimony of Nathan Links, an attorney, and Barbara Reaka, a paralegal working for the same office as Mr. Links. Both testified that they witnessed Eddie come into their office in Belleville, Illinois, and witnessed him sign the will at issue in this case. Links testified that he did not have a specific recollection of the signing

3

of the will but would not have signed the will as a witness if he did not believe Eddie to have been of sound mind and memory at the time of signing. Likewise, Reaka had no specific memory of signing the will but indicated that she would not have signed it as a witness had she not believed Eddie to be of sound mind at that time. Links also testified that a different attorney with his office, Edward Blake, had prepared the will. As such, while Links would have gone over the will with Eddie prior to signing, he was unaware of why Eddie had disinherited Kevin in the will.

¶ 7    Following the admission of that transcript, Kevin asked the trial court to take judicial notice of Georgia's responses to his July 3, 2024, request for admission of facts and genuineness of documents. The trial court did so without objection. Two of the facts stated as part of the request for admission of facts read:

> "26. On or about March 28, 2021, you opened a certain Certificate of Deposit #[account number] at People's National Bank in the amount of $315,179.54.

> "27. The funds used to open said Certificate of Deposit #[account number] came from Edwin L. Ticknor, Jr., and you contributed no funds to said deposit."

Georgia's response admitted both of those facts.

¶ 8    Kevin then called Linda Walker, Eddie's sister, as a witness. She testified that she and Eddie had another sister, RuthAnn Malcolm, who passed away 4½ to 5 years ago. She testified that she and Eddie were very close. The Ticknor family owned a farm in Marion County going back eight generations, immediately adjacent to the farm where Eddie, Linda, and RuthAnn grew up. In roughly 2013, the family farm was deeded to a limited partnership named L&R Farms, with "L" standing for "Linda" and "R" standing for "Ruth," and with Linda and RuthAnn acting as the original partners in L&R Farms. As part of the partnership agreement, membership in the partnership was limited to family members so that the farm would remain within the family.

4

¶ 9    Linda testified that Kevin was Eddie's only child. Linda described the relationship between Eddie and Kevin as having always been good and noted that Eddie would often have dinner at Kevin's residence. Kevin also worked for Eddie at his business, which provided heating and cooling services. The business serviced Casey's gas stations in three states, and Linda described the business as "quite successful." Linda testified that Eddie successfully ran his business himself until he had a heart attack in January 2022, while working at a Casey's store.

¶ 10    Linda acknowledged being aware that Eddie had a relationship of some sort with Georgia for about 30 years, commencing after his divorce from Kevin's mother. During that 30-year period, she never knew Eddie to have a romantic or sexual relationship with anyone else. Linda described the exact nature of the relationship between Eddie and Georgia as "very questionable," indicating that it was "just so odd that we [(relatives, cousins, family)] just couldn't figure it out." She indicated that, throughout the relationship, Georgia had been married to Ralph and that, not long after Eddie had met Georgia, he began to isolate "somewhat" from Linda and the rest of the family. Linda described Eddie as arriving for family meals, beginning to eat, then receiving a call from Georgia and having to leave, describing the phenomenon as being "almost like he had a tracker on him." Linda also described Georgia as "always" appearing at family functions, with Ralph never making an appearance with her. Linda testified that, at one point during a family function where Georgia was present, Linda's ex-husband, Eddie Veltman, who worked as an attorney in Marion County, offered his services for free in procuring a divorce for Georgia from Ralph but that Georgia had ignored the offer, acting as though she had not heard it. Later, Georgia began referring to herself as Eddie's fiancée while wearing a "huge diamond" that she indicated Eddie had bought for her, although she was still married to and living with Ralph at the time. Linda testified that she knew Eddie and Georgia to have gone out to dinner together many times, that they often went

5

shopping together, and that they took at least two overnight trips together, one to Branson, Missouri, and one to Las Vegas, Nevada. She also knew Eddie took Kjay on excursions as well. Linda testified that she never actually discussed the relationship with her brother, in part because she believed it was so odd.

¶ 11    With regard to the family farm and Georgia, Linda testified that, when her parents originally created L&R Farms, they had excluded Eddie from the partnership based on worries that Georgia might convince Eddie to give her his stake in the farm. Sometime around 2015, litigation arose between RuthAnn and the rest of the family over the partnership, and a settlement was reached wherein Linda was assigned half of RuthAnn's stake in the partnership and Eddie was given the other half. This resulted in Linda holding a 75% stake in the partnership and Eddie holding a 25% stake. At the time of the transfer, there were discussions between Eddie and Linda about his role in the farm and partnership. As part of those discussions, it was agreed that Linda would act as general manager of the farm and that the farm would stay entirely within the family, as delineated by the partnership agreement.

¶ 12    Linda testified that Eddie had never made her aware of his intent to devise his interest in L&R Farms to Kjay, in violation of the terms of the partnership agreement. Linda stated that she did not understand why he would have devised his interest in that fashion and was completely shocked by him having done so. Linda also owned the home that she and Eddie grew up in, located on Boone Street Road in Sandoval, as tenants in common with Eddie. Linda owned a two-thirds interest in that property, having bought out RuthAnn's children for RuthAnn's one-third interest when RuthAnn passed, and Eddie owned the remaining one-third. Linda testified that she had been unaware that Eddie was devising his one-third interest in that property to Kjay until after he passed away, just as with his interest in L&R Farms.

6

¶ 13    Linda described Eddie as a gentle, kind, hardworking man but stated that she had noted personality changes in him around 2015. At that time, Linda noticed Eddie starting to repeat himself "all the time" and that the repetitiveness worsened over time. Linda described this personality change as culminating in a "bizarre" incident around 2017 where Eddie accused Kevin of sabotaging his work with Casey's. During that incident, Eddie called Linda, crying uncontrollably, and said that Kevin had gone to a Casey's store, completed a job while claiming that he was Eddie, and had done so incorrectly. This accusation caused a rift between Eddie and Kevin, but the two eventually reconciled. Linda testified that Georgia told her she also noted a change in Eddie's behavior and that Eddie had been having ministrokes.

¶ 14    Linda testified that, in 2022, Eddie was readmitted to the hospital after a six to eight week stay at Georgia and Ralph's home following his heart attack and open-heart surgery. She was approached by Georgia, who had medical and financial power of attorney over Eddie, about Linda seeking guardianship of Eddie so that Linda could handle his medical care. Linda testified that Ralph was the successor power of attorney both medically and financially and she found that to be peculiar and strange. She did not know that Georgia was Eddie's agent under a power of attorney nor that Ralph was the successor agent, until Georgia contacted her about obtaining guardianship over Eddie.

¶ 15    Linda pursued and gained guardianship over Eddie. Linda testified that she took charge of his finances, including paying Eddie's bills, which had not been paid for at least two months. Linda noted in particular that Eddie's "hospital insurance" was a week away from lapsing while he was still in the hospital. In order to pay Eddie's bills, Linda testified that she went to Eddie's home office and began going through paperwork. While doing so, she found documentation of several transfers to Georgia's account of over $100,000 each, in addition to weekly $2,000 transfers going

back some time. Linda testified that it appeared that Eddie was paying several bills for Georgia and Ralph, describing it as "all of their pharmacy, clothing, utilities, everything, insurances, everything." She also learned that at People's National Bank in Centralia there were multiple certificates of deposit (CDs) worth over a million dollars in the aggregate held either jointly with Georgia or that were payable on death to Georgia. After learning about the CDs, Linda testified that she went to the bank and spoke to an employee, Donna Cooksey, and had all joint or payable on death accounts Eddie held with Georgia switched solely to Eddie's name.

¶ 16    Linda testified that she first found out about the will and its contents shortly after Eddie's final admission to the hospital. It was at that time, as Eddie was being airlifted to another hospital, that Georgia began telling Linda about the will. Linda described Georgia as being excited when talking about the will and stating that, based on the will, she and Kjay would "always be taken care of and never have another thing to worry about in their life." After Eddie passed on June 23, 2022, Linda contacted Georgia about the will, indicating it needed to be filed with the court and asking for a copy of the will. Linda described Georgia as dragging her feet about the matter, but eventually Linda took Georgia to the courthouse to file the will, at which time she also got a copy of the will. However, Linda testified that, before she had the time to look over the will, Georgia informed her that she and Kjay had been bequeathed "everything." Linda testified that she protested about the farmland, to which Georgia responded that she would give her the land but told her not to give it to Kevin. Within a few days, however, Linda indicated that Georgia had retained an attorney and "everything had changed."

¶ 17    With regard to the provisions of the will itself, Linda described herself as knowing her brother better than anyone else and asserted that what the will provided for was exactly the opposite of conversations she had with Eddie. She could think of no rational reason for Eddie to have given

his stake in the family farm and the rest of his assets to Georgia and Kjay, nor could she think of any rational reason for him to have disinherited his grandchildren.

¶ 18 Following Linda's testimony, exhibits showing bank account information, including the CDs Linda had testified about, descriptions and values of real estate within Eddie's estate, descriptions and values of real estate held by L&R Farms, and the partnership agreement for L&R Farms were all admitted without objection. Kevin was then called to testify.

¶ 19 Kevin testified that it was sometime during his teenage years that his father met Georgia. When Eddie introduced him to Georgia, she told him, "I slept with your dad at the rest area last night." Kevin testified that, at the time, he did not know that Georgia was married and living with Ralph. Kevin also testified to the same sorts of occurrences involving Eddie and Georgia as Linda described. Kevin stated that he never asked his father about the nature of his relationship with Georgia.

¶ 20 Kevin testified that Eddie was an interested grandfather and was around for birthdays and holidays. Kevin felt they had a loving relationship. Eventually, Kevin married Charity. He and Charity shared no children, but Kevin testified he had two stepdaughters through her. Eddie formed a relationship with Kevin's stepdaughters as well, and the relationship appeared to be loving on all sides. Kevin was unaware of any issues or rifts between his father and stepdaughters or biological children.

¶ 21 Sometime after Kevin completed his two-year degree, his father began his heating and cooling business. Kevin testified that he would frequently accompany Eddie to help with completing jobs. His father started doing work for Casey's around early 2000. Kevin testified that he continued to help with his father's business. Kevin described his relationship with his father as good during that time and that his father appreciated his help and was proud of him.

¶ 22    Kevin also gave his own account of the incident from approximately 2017 when Eddie had accused Kevin of impersonating him while doing a Casey's job incorrectly. Kevin testified that he had no idea why his father had accused him of doing that and that it had caused a rift in the relationship between him and his father, although the two eventually reconciled after a period of around five or six months.

¶ 23    Kevin testified that his father had told him the history of the Ticknor farm and also made statements about the farm staying in the Ticknor family. Kevin stated his father had never talked to him about what his plans were for his assets after he passed. Kevin stated that, other than the five- or six-month period following the impersonation allegation, there were no other rifts between him and his father.

¶ 24    Kevin, like Linda, also noted changes in Eddie starting around 2015. Kevin testified that his father was more irritable with small things setting him off where they had not previously. Eddie also began showing memory problems, such as working on a job and then immediately forgetting he had done so.

¶ 25    Kevin later admitted that he had no evidence that Georgia had induced Eddie to execute a power of attorney, execute the March 4, 2018, will, or place her as joint owner or beneficiary on any of his accounts. He further admitted that he had no evidence his father lacked mental capacity when executing his will and was unaware of what events led to the drafting of the will or the powers of attorney.

¶ 26    Kevin's wife, Charity Ticknor, then testified on his behalf, echoing Kevin's testimony and accounting of events. Rhea Hutchings, Kevin's stepdaughter, then testified, stating that Kevin was the only father she had ever known and that Eddie had acted as her grandfather. She testified that the two had a loving relationship. She recalled that an incident occurred between Kevin and Eddie

"because of some HVAC work" and in her recollection, while Kevin had tried to make amends, Eddie did not appear interested, describing contact as being "minimal" after that. Courtney and Bethany Ticknor, Kevin's daughters, also testified. Both testified that they shared a normal, loving relationship with Eddie. Courtney testified that she knew of no reason why he would have disinherited Kevin, and Bethany testified that she was very surprised by her father being disinherited in favor of Georgia and Kjay.

¶ 27    Kevin then called Georgia as an adverse witness. Georgia testified that she had been married to Ralph for 53 years and during that marriage the two had always lived together and shared a bed. Georgia had a son, BJ, and a granddaughter, Kjay. Prior to retiring, Ralph worked as a diesel mechanic, and Georgia worked as a dental assistant instructor. She opened her own dental school in Centralia, Illinois, but later moved the school to a property owned by Eddie. She testified that Eddie bought the property as an investment, then asked if she wanted to put her dental school on the property, charging Georgia and her business partner, Kathleen Murray, rent. The school remained there until Georgia retired in 2016.

¶ 28    Georgia testified that she first met Eddie in 1976 when he was still married and Kevin was approximately five or six years old. She met him through her mother and stepfather, as her stepfather had a marital connection to Eddie's family. She testified the two did not actually become friends until 1986 or 1987. Eventually the friendship developed to the point that she, with Kjay sometimes accompanying, would go shopping with Eddie every other Saturday. Georgia stated she would go over to Eddie's house and helped clean his house. She was sometimes accompanied on these trips by Ralph, who would fish in the pond in Eddie's front yard. They also took four overnight trips to Branson, Missouri, with Kjay. Ralph never went to Branson with them, and during each trip, all three stayed in the same hotel room over multiple nights. Georgia testified

11

there was a trip to Las Vegas for a dental convention that Eddie accompanied her on, but that was also attended by her business partner, Kathleen. Georgia testified that her relationship with Eddie was such that, as of at least around 2000, he had trust and confidence in her. For a period of time, she paid Eddie's bills, ran errands for him, and picked up his medication. Georgia stated that Eddie gave her no money but did give her and her family gifts for special occasions like birthdays and Christmas. Georgia described Eddie as her best friend and denied any type of sexual relationship with Eddie, although she described Eddie as having unrequited romantic feelings for her.

¶ 29    Georgia stated that Eddie was not prone to conspiracy theories or getting ideas not based in facts. She was aware of the rift that had formed between Kevin and Eddie when Eddie had accused Kevin of going to a Casey's store and doing a job improperly. She testified that Eddie had told her about what Kevin had supposedly done and that she told Eddie that she did not think Kevin would do something like that. She also testified that she encouraged Eddie to reconcile with Kevin. Georgia stated that, when she attempted to ask Eddie why he would think Kevin had done that, he told her he did not want to talk about it. She characterized the accusation as bizarre. Despite that, Georgia did not develop any concerns about Eddie's mental condition based on that incident.

¶ 30    At some point after that incident, around 2020, Georgia testified that Eddie also claimed to her and Ralph that Kevin was trying to get women from Eddie's high school days to claim they had a child with Eddie and sue him for child support. She denied that he made claims about Kevin other than the alleged child support scheme and botched Casey's job.

¶ 31    Georgia testified that Eddie told her on more than one occasion that he did not care for his grandchildren and considered Kjay to be his only grandchild. Georgia stated that she considered Eddie's statement about not caring for his own grandchildren to be strange and bizarre. Georgia further expounded on the close relationship between Eddie and Kjay, stating that he would take

12

her shopping or to the movies, bought her gifts, and attended school activities. Georgia testified that Eddie would even miss work to attend school functions with Kjay. She was unaware of him having done that for his biological grandchildren.

¶ 32   Georgia claimed that she first gained knowledge of the contents of Eddie's will about six weeks after he executed it, although he earlier told her that he was planning on trying to find an out-of-town attorney to draw up a will. She testified that Eddie arrived at her house about three weeks after executing the will with a brown envelope, handed it to her, and told her it contained his will. At the same time, he told her that he made her his power of attorney, which he explained as being able to make decisions for him if he found himself unable to talk or make decisions for himself. Georgia claimed Eddie had not asked her about acting as his power of attorney prior to executing the power of attorney documents. Approximately three weeks after that, Eddie told her about the contents of the will. Georgia claimed to not know exactly what that entailed, as she did not know exactly what real estate Eddie owned or had an interest in, nor did she know what his other financial assets looked like. Georgia stated that she was aware the family farm existed but that Eddie had not spoken to her about plans for it to stay in the family. Georgia denied ever asking Eddie to leave either her or Kjay anything in his will.

¶ 33   Georgia denied that she had approached Linda about taking over Eddie's care. Georgia testified that Linda approached her about gaining guardianship over Eddie in 2022 after his heart attack. Georgia confirmed having told Linda about the contents of the will after she filed it.

¶ 34   Georgia was recalled to testify by her attorney. During that testimony, she described Ralph and Eddie as friends but not close friends. She testified that Eddie spent holidays with her and Ralph and had been doing that since roughly the 1980s or 1990s, before Kjay was born. Georgia testified that both she and Ralph considered Eddie to be family. Georgia asserted that the only trips

13

she had ever taken with Eddie were the trips to Branson and the trip to the Las Vegas dental convention. She denied having taken a trip with Eddie alone. She also denied that Eddie paid any of her bills or using Eddie's money to pay her bills. She further denied ever having asked Eddie for money. Georgia claimed that she found out that Eddie put a CD solely in her name after the fact when she received a tax form. She also claimed that she first learned that Eddie made her the joint owner of one of his vehicles after his death. Georgia also claimed that she was unaware of the CDs that were held jointly with Eddie or to which she was the death beneficiary prior to Linda removing her from those accounts.

¶ 35    Georgia testified that, after Eddie's heart attack, he lived with Georgia and Ralph for approximately a month. After that, Eddie returned home and was living independently.

¶ 36    Georgia denied ever telling anyone that Eddie had gotten her a diamond engagement ring. She also denied ever telling Kevin that she had sex with his father. Georgia acknowledged that she told Linda that Eddie had ministrokes. Georgia testified that, up until his heart attack, Eddie continued to run his heating and cooling business, working full time. He also managed his own finances up until that time. At all times he knew who Kevin was and who his grandchildren were. Georgia testified that Eddie never seemed confused, paranoid, or delusional and that his memory was good. Georgia testified that she did not know why Eddie had drafted his will as he had.

¶ 37    Georgia called Donna Cooksey as a witness. Cooksey testified that she was employed as a retail sales manager at People's National Bank and had been employed at that bank for the past 24 years. She testified that, after Linda presented guardianship papers for Eddie, she changed the joint ownership and payable-on-death designations for Eddie's CDs.

¶ 38    Kjay was then called as a witness. She testified that her biological mother died when she was 8 and then she went to live with Georgia and Ralph, her biological grandparents, at age 12,

14

when they also adopted her. She testified that she had known Eddie her whole life and called him both "grandpa" and Eddie. Eddie would also sometimes tell other people that Kjay was his grandchild. Even prior to Kjay moving in with Georgia and Ralph, she had frequent contact with Eddie, seeing him about once a week. Kjay testified that, during that time, she, Eddie, Georgia, and Ralph would often go out to eat together, would spend holidays and birthdays together, and exchanged gifts. She testified that, during that same period, she went on vacations with Eddie and Georgia at least three times. After she moved in with her grandparents, Kjay indicated she saw Eddie even more often, estimating it was about three or four times a week at that point, and that Eddie would often eat supper with the family. Overall, Kjay testified that Eddie was a frequent presence in her life, taking her places such as the movies and attending school events, parades, concerts, and the like. She described the relationship between herself and Eddie as being close and loving. Kjay testified that she did not notice any changes in Eddie's personality or behavior in 2017 or 2018.

¶ 39 Kjay described the relationship between Eddie, Georgia, and Ralph as being best friends. She stated she never saw any hint of a romantic relationship between Georgia and Eddie nor had she ever seen Ralph and Eddie have any issues with one another. Kjay testified that she would have been surprised if Eddie had expressed romantic interest in Georgia, as she described Eddie as a "gentleman." She described Ralph and Eddie as frequently helping one another out. Kjay testified that she was not surprised when Eddie had gone to stay with Georgia and Ralph after his heart attack, because Georgia and Ralph "would have done anything for him. That was his safe place to go."

¶ 40 Kjay testified that she was aware that Eddie had a son named Kevin and biological grandchildren but that he never really talked about them. She did not recall Eddie having ever

15

made any statements about not loving either Kevin or his grandchildren or not having a relationship with them. Kjay was unaware of why Eddie would have disinherited Kevin or his grandchildren.

¶ 41   Kjay testified that she first found out that Eddie had left her things in his will when Kevin sued over the will. She stated she had never asked Eddie to leave her anything and did not know the attorney who had drafted the will. Eddie had never discussed finances with her, nor had she heard him discuss finances with her grandparents. She was unaware that Eddie designated Georgia as his power of attorney, nor was she aware of any joint holdings. Kjay stated she had not known that Eddie owned farmland or had any interest in a family farm.

¶ 42   Ralph testified next. He testified that he was a retired mechanic, had been married to Georgia for 53 years, and had been friends with Eddie since 1976. He considered him to be a good friend and like family. He stated that he and Eddie went fishing together and did a fair amount of mechanical work together, and Ralph indicated he worked on things for Eddie's business. Ralph testified that he, Georgia, and Kjay would go over to Eddie's house for barbeques and would go out to eat with him as well. They also often spent holidays together and exchanged gifts on special occasions. More specifically, during approximately the last five years of Eddie's life, he would come over to Georgia's and Ralph's home frequently, around three or more times a week. Ralph did not feel that Georgia was closer friends with Eddie than he was, indicating that he felt that they were both close with Eddie, although he acknowledged that Georgia and Eddie would sometimes do things together alone. He also acknowledged that Georgia, Kjay, and Eddie had taken vacations to Branson, staying in a single hotel room together, without him. Ralph testified he did not worry about any of this, describing Eddie as a "gentleman." He admitted that, about 10 years prior, Eddie told Georgia that he had romantic and sexual feelings for her, but he denied having any concern about Georgia and Eddie's relationship.

16

¶ 43    Ralph denied that Eddie had paid his and Georgia's bills and denied that he ever asked Eddie for money. Ralph testified that Georgia occasionally paid bills for Eddie when he was out of town. Ralph denied any involvement in the drafting of Eddie's will and stated that he and Georgia were not informed of the will's contents until roughly a month after it was drafted. Even then, Ralph testified he and Georgia were only generally informed that Georgia and Kjay would be receiving something. He was not aware of the exact nature of the bequests until after Eddie died. Ralph testified that he was unaware of the powers of attorney until after they were executed. He was aware of the existence of the Ticknor farm but did not know anything else about Eddie's financial or real estate assets. At some point Eddie told him and Georgia that Eddie placed Georgia's name on some CDs, although he could not recall exactly when.

¶ 44    Ralph testified that he did not notice any change in Eddie's personality or memory around 2017 or 2018. However, he did recall the incident where Eddie claimed that Kevin tried to sabotage his business with Casey's. Ralph described the incident as less "bizarre" and more funny, and he indicated that Eddie never gave any reason why Kevin would do such a thing. Ralph agreed that the accusation came out of the blue. Ralph confirmed that Georgia encouraged Eddie to reconcile with Kevin over the issue and testified that the reconciliation did not occur until a few months after the initial accusation. Ralph also recalled Eddie having claimed that Kevin was trying to get women from Eddie's past to claim they had Eddie's child and sue him for child support. In Ralph's recollection, that accusation had occurred some years before the accusation involving Casey's.

¶ 45    According to Ralph, up until his heart attack, Eddie continued running his business and was at a Casey's job when the heart attack occurred. After the heart attack, Ralph testified that Georgia was unable to continue acting as his power of attorney, due to her own health.

¶ 46    After hearing closing arguments, the trial court noted that it found Linda's interest in the matter to be minimal and her testimony credible, while it found Georgia's testimony regarding her relationship with Eddie not credible and called into question her credibility overall. The trial court took the matter under advisement and later issued a written judgment order.

¶ 47    In its judgment order, the trial court found that Kevin had not overcome the presumption that Eddie was competent at all relevant times. The trial court cited the fact that Eddie had continued to manage his business and finances up until his heart attack and during the period that he executed his will. The trial court noted that Georgia, Ralph, and Kjay had all denied any sort of romantic relationship between Georgia and Eddie and explicitly found none of that testimony to be credible. Instead, the trial court found that the relationship between Eddie and Georgia was "clearly a deep, romantic relationship," with Georgia acting as Eddie's "life partner and spouse." With regard to the count alleging undue influence by Georgia, the trial court noted that, to find undue influence, it needed to find the existence of five discreet factors, including that Eddie was dependent upon Georgia. Citing Eddie's management of his own affairs and business at the time the will was executed, the trial court found that Eddie was not dependent on Georgia and that Kevin did not prove undue influence by Georgia. Finally, with regard to the allegations of financial exploitation, the trial court found no evidence of intimidation by Georgia of Eddie but "some evidence" of deception. The trial court found that Eddie had clearly thought there was a romantic relationship and that, once Eddie became critically ill, Georgia quickly gave up her responsibilities as Eddie's healthcare power of attorney. However, the trial court stated that this evidence "merely suggests deception; it does not establish deception." Thus, the trial court found that Kevin did not prove financial exploitation of Eddie. The trial court did not explicitly rule on whether a presumption of fraud based on the fiduciary relationship should or should not apply to any of the

18

counts alleged by Kevin, but in making its ruling, the trial court stated that Kevin had not met his burden as to each count and nowhere applied a presumption of fraud.

¶ 48    After judgment was entered in favor of respondents on all counts, Kevin filed a timely posttrial motion asserting that the trial court had erred by not applying the presumption of fraud to transactions benefitting Georgia occurring after the execution of the powers of attorney, in finding Eddie was not dependent upon Georgia, in finding Eddie had testamentary capacity, and in not presuming that the attorney who prepared the will would have testified adversely to Georgia based on her failure to call him as a witness. After hearing arguments, the trial court issued a written order denying the motion. In that written order, the trial court found that it had properly declined to apply the presumption of fraud, as the presumption of fraud required proof that Georgia, as a fiduciary, used her power as an agent to transfer property into her own name. The trial court found that no evidence was presented regarding how or when the CDs were created and placed in Georgia's name. The trial court likewise found that it had properly not applied an adverse presumption regarding the attorney's failure to testify, as that witness was equally available to both parties, due to attorney-client privilege having been waived. The trial court also reiterated in that order that Eddie's management of his business and financial affairs showed testamentary capacity and noted that there was no evidence that Georgia wrote or procured Eddie's will. This appeal followed.

¶ 49                                    II. ANALYSIS

¶ 50    On appeal Kevin raises a total of five claims of error. First, he claims that the trial court's finding that Eddie had testamentary capacity was in error and against the manifest weight of the evidence. Next, Kevin claims that the trial court erred by finding that respondents did not exert undue influence over Eddie by finding that Eddie was not dependent on Georgia. Kevin further

19

claims that the trial court erred by failing to presume that the testimony of attorney Edward Blake, whose testimony the respondents did not procure and who prepared Eddie's will, would have been adverse to Georgia. Kevin also claims that the trial court erred by failing to presume that transactions benefitting Georgia and Kjay were presumptively fraudulent. Finally, Kevin claims error in the trial court's finding that respondents did not financially exploit Eddie.

¶ 51                                    A. Testamentary Capacity

¶ 52    On appeal, Kevin claims the trial court erred in finding that Eddie had testamentary capacity when he executed his will on May 4, 2018. Kevin asserts that, at the time of the execution of the will, the evidence showed that Eddie was suffering from an insane delusion, in the form of his "delusional and paranoid beliefs" regarding Kevin, which rendered the will invalid.

¶ 53    A decedent is presumed to have testamentary capacity, and the burden is on the one asserting lack of testamentary capacity to prove the lack of testamentary capacity. *Sloger v. Sloger*, 26 Ill. 2d 366, 370 (1962).

> "The standard test of testamentary capacity, *i.e.*, soundness of mind and memory, is that 'the testator must be capable of knowing what his property is, who are the natural objects of his bounty, and also be able to understand the nature, consequence, and effect of the act of executing a will.' " *DeHart v. DeHart*, 2013 IL 114137, ¶ 20 (quoting *Dowie v. Sutton*, 227 Ill. 183, 196 (1907)).

The natural objects of one's bounty are those "related to him by ties of blood or affection, and thus are those who are or should be considered to be recipients of his bequests." *Id.* Lacking any one of those factors indicates a lack of testamentary capacity. *Id.* "It is also possible for testamentary capacity to be destroyed if one suffers from a mental delusion as to one of the objects of his bounty, even though he may recall other objects of his bounty on the face of the contested will." *Id.* Where

20

a decedent "has sufficient mental capacity to transact ordinary business and act rationally in the ordinary affairs of life," he has testamentary capacity. *Sloger*, 26 Ill. 2d at 369. The standard of review for a trial court's decision regarding testamentary capacity is whether that decision was against the manifest weight of the evidence. See *In re Estate of Elias*, 408 Ill. App. 3d 301, 317 (2011).

¶ 54     Here, it is undisputed that Eddie managed his own finances and his business up until his heart attack in January 2022, nearly a full four years after the execution of his will. The trial court relied on this fact in finding that Eddie had testamentary capacity at the time he executed his will. Kevin challenges this finding by pointing to Eddie's bizarre belief in 2017 that Kevin had tried to sabotage his business, his belief that Kevin was trying to get women from Eddie's past to claim they had a child with him and sue Eddie for child support, testimony that Eddie had suffered from ministrokes, and testimony that Eddie had undergone personality changes and a declining memory starting in roughly 2015. Kevin claims this is evidence of the sort of mental delusion that would defeat Eddie's presumed testamentary capacity. However, there was no evidence that Eddie was acting in a bizarre or confused manner at the time he executed his will. Nor was there any evidence presented that Eddie suffered from any medical condition that affected his mental state at the time the will was executed. Further, while even Georgia characterized Eddie's claims against Kevin as "bizarre," it is also uncontroverted that Kevin and Eddie reconciled a few months later. Eddie was managing his own business affairs at the time he executed his will and subsequent thereto. The trial court's finding that Kevin did not prove that Eddie lacked testamentary capacity to execute his will was not against the manifest weight of the evidence.

¶ 55                                 B. Undue Influence

¶ 56    Kevin next challenges the trial court's finding that Eddie was not subject to undue influence in the execution of his will by Georgia. He does this by making two claims. The first is by challenging the trial court's finding that Eddie was not dependent on Georgia, as would be required for a finding of undue influence. The second is by asserting that the trial court should have applied an adverse presumption to Georgia's failure to call the attorney who drafted Eddie's will to testify.

¶ 57    Undue influence is defined as the improper influence of one person over another " 'whereby the will of a person is over-powered and he is indeed induced to do or forbear an act which he would not do or would do if left to act freely.' " (Internal quotation marks omitted.) *DeHart*, 2013 IL 114137, ¶ 27 (quoting *In re Estate of Hoover*, 155 Ill. 2d 402, 411 (1993)). This influence "must be of such a nature as to destroy the testator's freedom concerning the disposition of his estate and render his will that of another." (Internal quotation marks omitted.) *Id.* One type of undue influence arises from abuse of a fiduciary relationship and occurs when

> "(1) a fiduciary relationship exists between the testator and a person who receives a substantial benefit from the will, (2) the testator is the dependent and the beneficiary the dominant party, (3) the testator reposes trust and confidence in the beneficiary, and (4) the will is prepared by or its preparation procured by such beneficiary." (Internal quotation marks omitted.) *In re Estate of Coffman*, 2023 IL 128867, ¶ 47.

See *DeHart*, 2013 IL 114137, ¶ 30. The standard of review for a trial court's decision regarding a finding of undue influence is whether that decision was against the manifest weight of the evidence. *Klaskin v. Klepak*, 126 Ill. 2d 376, 389 (1989).

¶ 58                                    1. Finding of No Dependence

¶ 59    In looking at whether Eddie was subject to undue influence by Georgia, the trial court found, correctly and without dispute from either party, that a fiduciary relationship existed between Eddie and Georgia by virtue of the powers of attorney. "As a matter of law, a power of attorney gives rise to a general fiduciary relationship between the grantor and the grantee." *DeHart*, 2013 IL 114137, ¶ 31. The trial court also found that Georgia received a substantial benefit under Eddie's will and that Eddie reposed trust and confidence in Georgia. However, the trial court found that Eddie was not dependent on Georgia and found no evidence that Georgia procured or was otherwise instrumental in preparation of the will. Kevin asserts the finding of lack of dependence is in error, citing testimony that Eddie relied on Georgia; that she would pay his bills, ran errands for him, and picked up his medicine; and that he would leave family gatherings to be with Georgia. Georgia counters that this evidence is that of a friend rendering assistance rather than any showing of the sort of dominance required to support a finding that Eddie was dependent upon Georgia.

¶ 60    Case law gives no exact definition of what it means to be dependent on another when it comes to abusing a fiduciary relationship such that it amounts to undue influence. However, it is clear that dependence is something more than the existence of the fiduciary relationship itself, as both are separate elements of undue influence. See *In re Estate of Reynolds*, 2022 IL App (4th) 210039-U, ¶ 30. Further, the level of dependence required is something more than help with life tasks or reliance on another party, and a testator's ability to manage his own affairs, much as it weighs toward the existence of testamentary capacity, weighs against a finding of dependence. See *In re Estate of Baumgarten*, 2012 IL App (1st) 112155, ¶¶ 25-26; *Nemeth v. Banhalmi*, 125 Ill. App. 3d 938, 963-64 (1984); *In re Estate of Glogovsek*, 248 Ill. App. 3d 784, 796 (1993). Whatever the exact definition, it is the "kind of dependence resulting from weakness or debilitation that will

23

tend to show domination and undue influence by a fiduciary." *In re Estate of Osborn*, 128 Ill. App. 3d 453, 456 (1984).

¶ 61    The trial court's finding that Eddie was not dependent on Georgia at the time he executed his will was not against the manifest weight of the evidence. While there was some testimony that Georgia paid bills for Eddie by dropping off checks while he was out of town, picked up medications for him, and other similar activities, these few tasks do not establish such a weakness or debilitation on Eddie's part that he was dependent on Georgia such that his will was unduly influenced by her. Instead, it is again uncontested that, at the time of the execution of his will, Eddie was managing his own business affairs independently rather than depending on Georgia. As such, the trial court's finding that Eddie was not dependent on Georgia or the other respondents was not against the manifest weight of the evidence.

¶ 62                    2. Adverse Presumption Regarding Attorney Testimony

¶ 63    Kevin next asserts that the trial court erred by failing to apply an adverse presumption against respondents for their failure to call Edward Blake, the attorney who drafted Eddie's will. While Kevin never specifies the exact testimony that should be presumed from Blake in his favor, he implies that this testimony would support his claim of undue influence.

¶ 64    While this case did not involve a jury trial, we note that Illinois Pattern Jury Instructions, Civil, No. 5.01 (approved Dec. 8, 2011) (hereinafter IPI Civil No. 5.01)) outlines the circumstances under which an adverse inference may be drawn from a party's failure to produce evidence or a witness. IPI Civil No. 5.01 states:

> "If a party to this case has failed [to offer evidence] [to produce a witness] within
>
> his power to produce, you may infer that the [evidence] [testimony of the witness] would
>
> be adverse to that party if you believe each of the following elements:

24

1. The [evidence] [witness] was under the control of the party and could have been produced by the exercise of reasonable diligence.

2. The [evidence] [witness] was not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have [offered the evidence] [produced the witness] if he believed [it to be] [the testimony would be] favorable to him.

4. No reasonable excuse for the failure has been shown."

By its own wording, this presumption is permissive not mandatory, and in reviewing whether a trial court has erred in failing to even give the instruction, the highly deferential abuse of discretion standard applies. See *Lakin v. Casey's Retail Co.*, 2018 IL App (5th) 170152, ¶ 50.

¶ 65    The trial court did not err in failing to apply an adverse presumption to Georgia's failure to call Blake as a witness. IPI Civil No. 5.01 explicitly requires that the witness "was not equally available to an adverse party." Blake was equally available to Kevin as a witness. Attorney-client privilege between Eddie and Blake no longer existed, as Eddie's death had terminated the privilege with regard to the will and all parties had executed a waiver of any privilege on September 9, 2024. See *DeHart*, 2013 IL 114137, ¶ 69. Kevin admits this privilege no longer applies, but he asserts that Blake was not equally available to him because the attorney who drafted a will would presumably be biased in his testimony towards seeing the will upheld. We disagree. An attorney, no longer bound by a duty of privilege and subject to ethical rules requiring candor to the tribunal, is not so biased as to make him unavailable as a witness. Ill. R. Pro. Conduct (2010) R. 3.3 (eff. Jan. 1, 2010). As such, he is not unavailable to an adverse party, and thus the trial court did not err in failing to apply an adverse presumption against respondents regarding the absence of Blake's testimony.

¶ 66                          C. Financial Exploitation

¶ 67    Finally, in count III of his amended petition, Kevin made two separate but related claims. First, he made a civil claim under section 17-56(g) of the Criminal Code, alleging that respondents had financially exploited Eddie and his estate was entitled to recover treble damages and attorney fees from them. He then made the related claim under section 2-6.2(b) of the Probate Act that, because Georgia had financially exploited Eddie, she could not benefit from his will or in any other way from his death. Kevin alleges that the trial court erred in two ways in finding that Georgia did not financially exploit Eddie. First, he alleges that the trial court erred by not presuming fraud in line with the common-law presumption, and second, he alleges that the trial court's finding of no financial exploitation was itself erroneous.

¶ 68                            1. Presumption of Fraud

¶ 69    As noted earlier, Georgia, by virtue of the powers of attorney she held on Eddie's behalf, was a fiduciary to Eddie. See *DeHart*, 2013 IL 114137, ¶ 31. "A presumption of fraud arises when a fiduciary benefits from a transaction involving the principal." *In re Estate of Shelton*, 2017 IL 121199, ¶ 23. Kevin alleges that the trial court should have applied this presumption at trial and even asked the trial court to determine that it applied via a pretrial motion. The trial court declined to rule on the matter before the trial commenced but in its judgment order nowhere applied that presumption. Kevin asserts that this is error.

¶ 70    Section 17-56 of the Criminal Code outlines the elements for the criminal offense of financial exploitation of an elderly person or a person with a disability. Per the statute, financial exploitation occurs when

    "he or she stands in a position of trust or confidence with the elderly person or a person with a disability and he or she knowingly:

26

(1) by deception or intimidation obtains control over the property of an elderly person or a person with a disability; or

(2) illegally uses the assets or resources of an elderly person or a person with a disability." 720 ILCS 5/17-56(a) (West 2022).

The statute goes on to define several of its terms, defining an elderly person as a person "60 years of age or older" and partially defining the illegal use of assets or resources as something that "includes, but is not limited to, the misappropriation of those assets or resources by undue influence, breach of a fiduciary relationship, fraud, deception, extortion, or use of the assets or resources contrary to law." *Id.* § 17-56(c)(1), (4). Under subsection (g), it outlines a civil cause of action based on the same elements as the criminal offense, specifying both the degree of financial liability, treble damages of the amount of the property obtained plus reasonable attorney fees and court costs, and a preponderance burden of proof on the petitioner. *Id.* § 17-56(g).

¶ 71    Kevin alleges that the trial court should have applied the presumption of fraud to count III of his amended petition generally, which includes a claim of civil liability under section 17-56(g). Whether or not this presumption applies to civil liability under this statute is a matter of statutory interpretation, which we review *de novo*. *People v. Butler*, 2025 IL 130988, ¶ 31.

¶ 72    In determining whether the presumption of fraud applies to a civil suit brought under section 17-56(g) of the Criminal Code, we look to the language of the statute itself . A statute's language is the best evidence of the legislature's intent and should be afforded its plain and ordinary meaning. *Jordan v. O'Fallon Township High School District No. 203 Board of Education*, 302 Ill. App. 3d 1070, 1079 (1999) (citing *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990)). Section 17-56(g) explicitly called for a preponderance burden for a petitioner, stating "[i]n a civil action under this subsection, the burden of proof *** shall be by a preponderance of the evidence." 720

27

ILCS 5/17-56(g) (West 2022). The statute does list breach of fiduciary duty as a method of exploitation via the illegal use of assets or resources. However, it does not include language shifting the burden of proof to the defendant by applying a statutory presumption of fraud or financial exploitation. Kevin's argument amounts to a request that we read language into the statute that was not placed there by the legislature, in the form of the presumption. However, courts may not read language into a statute that is not there. *Shawnee Community Unit School District No. 84 v. Illinois Property Tax Appeal Board*, 2024 IL 128731, ¶ 45. Further, the statute expressly allows for suit to be filed under other causes of action, such as a common-law breach of fiduciary duty claim, to which this presumption does apply. See *id.* While Kevin did not file such a claim here, it is thus still available to a litigant should one wish to avail himself of this presumption. As such, we hold that the presumption of fraud that normally applies to transactions from or involving a principal that benefit a fiduciary does not apply to suits brought under section 17-56(g) of the Criminal Code. Therefore, the trial court did not err in failing to apply that presumption.

¶ 73 Kevin also made a claim in count III alleging that Georgia could not benefit from the will based on section 2-6.2(b) of the Probate Act. That section states, in relevant part:

> "persons who have been found by a preponderance of the evidence to be civilly liable for financial exploitation shall not receive any property, benefit, or other interest by reason of the death of that elderly person or person with a disability, whether as heir, legatee, beneficiary, survivor, appointee, claimant under Section 18-1.1, or in any other capacity." 755 ILCS 5/2-6.2(b) (West 2022).

In arguing that the presumption of fraud should have applied to count III of his amended petition, Kevin argues that it should have applied to this portion of that count as well. In looking at the language of section 2-6.2(b) of the Probate Act, we find it similar to that of section 17-56(g) of the

Criminal Code and thus find that, under the same reasoning, the presumption of fraud also does not apply to section 2-6.2(b) of the Probate Act.

¶ 74    Like section 17-56(g) of the Criminal Code, section 2-6.2(b) of the Probate Act specifies a preponderance burden of proof on the petitioner, stating it applies to "persons who have been found *by a preponderance of the evidence* to be civilly liable for financial exploitation." (Emphasis added.) 755 ILCS 5/2-6.2(b) (West 2022). As both statutes clearly specify a preponderance burden of proof on the petitioner, we will not read into either a presumption that shifts that burden to the respondent. Moreover, the language of section 2-6.2(b) of the Probate Act is a clear reference to section 17-56(g) of the Criminal Code. Given that, the same analysis supporting the rejection of a presumption applicable to a section 17-56(g) claim applies here, and we likewise find that the presumption does not apply to claims under section 2-6.2(b) of the Probate Act. Thus, the trial court did not err by failing to apply it.

¶ 75                    2. Finding of No Financial Exploitation

¶ 76    Finally, Kevin claims that the trial court erred by failing to find that Georgia financially exploited Eddie. In doing so, Kevin primarily argues that the trial court should have applied the presumption of fraud as discussed above and asserts that, because Georgia failed to adequately rebut it, the trial court erred in finding no financial exploitation. However, as we have decided that the presumption does not apply, we find no merit to this argument.

¶ 77    The trial court found that the evidence "suggests deception" and that Eddie "clearly" thought he had a romantic relationship with Georgia, while she denied one existed. However, the trial court found this did not rise to the level of deception. It found no evidence of intimidation and no evidence that Georgia had ever used any of Eddie's money illegally or without his knowledge. Again, without the presumption, the burden was on Kevin to establish deception, intimidation, or

29

illegal use of assets or resources. Applying the applicable standard of review, we cannot find that the trial court's finding that Kevin did not prove financial exploitation is against the manifest weight of the evidence. See *In re Estate of Kirk*, 292 Ill. App. 3d 914, 919 (1997).

¶ 78                                  III. CONCLUSION

¶ 79    For the foregoing reasons, we affirm the trial court's judgment.

¶ 80    Affirmed.

---

*In re Estate of Ticknor*, 2026 IL App (5th) 250501

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Marion County, No. 22-PR-56; the Hon. Mark W. Stedelin, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Eric L. Terlizzi, of Salem for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Rebecca L. Reinhardt, of Law Office of Rebecca L. Reinhardt, LLC, of Mt. Vernon, for appellees. |

---